# ILLINOIS OFFICIAL REPORTS

## Supreme Court

*People v. Leach*, 2012 IL 111534

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CURTIS LEACH, Appellant. |
| Docket No. | 111534 |
| Filed | November 29, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A bench murder conviction was upheld for a defendant who admitted he strangled his wife to death but claimed it was an accident where expert testimony as to the time it would take to die from strangulation permitted an inference of knowledge of a strong probability of death or great bodily harm—retired medical examiner's routine autopsy report finding the death homicidal not testimonial for purposes of *Crawford* rule. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas P. Panichi, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

Counsel on
Appeal

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Maya Szilak and Carolyn R. Klarquist, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Ashley A. Romito, Annette Collins, Yvette Loizon and Amy Watroba Kern, Assistant State's Attorneys, of counsel), for the People.

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Karmeier, Burke, and Theis concurred in the judgment and opinion.

Chief Justice Kilbride dissented, with opinion.

## OPINION

¶ 1    Defendant Curtis Leach was convicted after a bench trial in the circuit court of Cook County of the first degree murder (720 ILCS 5/9-1(a)(2) (West 2002)) of his wife, Latyonia Cook-Leach, and sentenced to 28 years' imprisonment. His conviction and sentence were affirmed on appeal. *People v. Leach*, 391 Ill. App. 3d 161 (2009). Upon defendant's initial appeal to this court, we vacated the appellate court's judgment and remanded the cause to that court for consideration in light of *People v. Williams*, 238 Ill. 2d 135 (2010). *People v. Leach*, 237 Ill. 2d 575 (2010) (supervisory order). After reconsideration, the appellate court again affirmed defendant's conviction. 405 Ill. App. 3d 297. We then allowed defendant's petition for leave to appeal under Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)). We are asked to determine whether admission of the opinion testimony of a pathologist other than the pathologist who performed the autopsy on the victim and of the autopsy report itself violated the rule of *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 2                           BACKGROUND
¶ 3    On June 30, 2004, defendant walked into the Harvey, Illinois, police station and reported that he had killed his wife. He later gave a full statement, which was video-recorded, in which he admitted strangling her, but stated that her death had been "an accident." He was charged with intentional murder (720 ILCS 5/9-1(a)(1) (West 2002)) and knowing murder (720 ILCS 5/9-1(a)(2) (West 2002)).

¶ 4    On March 26, 2007, defendant filed a motion *in limine*, seeking several rulings, including a ruling that would bar the State "from introducing testimony from any Medical Examiner

-2-

other than Dr. Eupil Choi, the only doctor who performed the autopsy." The motion *in limine* did not seek to bar the admission of the autopsy report itself. In the motion papers, defendant argued:

> "To allow any doctor other than the doctor who performed the actual autopsy to testify would be allowing the State to introduce hearsay evidence. This would be a violation of the defendant's right of confronting his accuser during cross-examination. According to the evidence provided by the State, the only doctor who has examined and performed the autopsy was Dr. Choi. Therefore his conclusion that the cause of death was homicide is his opinion based on his personal examination. To allow another doctor who has never examined the body, performed their own tests or written any reports regarding the victim and the cause of death would be purely hearsay. No other doctor has any personal knowledge as to how the victim died."

¶ 5 At the hearing on the motion *in limine*, defense counsel did not make additional argument. The State argued that:

> "Dr. Arangelovich is an expert in forensic pathology. She has been qualified as an expert here in Cook County in the area of forensic pathology other [*sic*] 15 times. She is board certified. She has conducted hundreds of autopsies.
>
> Your honor, she is coming in to offer her expert opinion as to the autopsy that Dr. Eupil Choi conducted on the victim, Latyonia Cook, back in June of 2004.
>
> Dr. Choi has retired and left the office. Dr. Arangelovich is not coming in with a *Crawford* issue because she's not testifying that she, in fact, conducted the autopsy of the victim, Latyonia Cook, in this matter.
>
> However, as an expert she is going to testify that she reviewed the information that Dr. Choi provided with the autopsy report, the protocol, the photographs, and in her expert opinion that she has opinions as to the manner of death and cause of death of Latyonia Cook."

¶ 6 The trial court denied the defendant's motion without comment.

¶ 7 At trial, the court heard testimony from a number of witnesses, including police officers and the victim's mother. For purposes of considering the issues raised in this appeal, the crucial evidence is defendant's videotaped statement and the testimony of Dr. Arangelovich.

¶ 8 Defendant's videotaped statement to the police and a transcript of the statement were entered into evidence without objection by the defense, and the tape was played in open court.

¶ 9 In his statement, he described coming home at 2:35 a.m., after working a 10-hour shift at a recycling facility. His wife and children were sleeping upstairs. He took off his shoes and fixed himself something to eat. After smoking a cigarette, he went upstairs to use the washroom. Then he went back downstairs to smoke another cigarette.

¶ 10 Eventually, he went back upstairs. He checked on the children and entered the bedroom he shared with his wife. She woke up and "looked around and saw it was" him and "she immediately got up" and put on a nightgown. He turned on the lights, but she "stood up and started talking" to him. He lay on the bed, still wearing his work clothes and smoking his

cigarette, and listened to her tell him that she "did not appreciate" the way he treated her; he did not "give her enough space to do what she want[ed] to do." He described her complaints as being similar to previous arguments, in which she complained about his "attitudes" and his "not talking to her."

¶ 11    Defendant explained that he just wanted to smoke his cigarette and go to sleep, but that his wife's complaints went on for "a good hour and a half," with him listening and dozing as he lay on his side of the bed. During this time, she was sitting on the side of the bed "Indian style," with her legs folded beneath her. According to defendant, his wife was raising her voice and he was concerned that she would wake the children. They had come into their parents' bedroom in the past when they had heard an argument, but on this night, they did not awaken.

¶ 12    He insisted to her that he was paying attention as she complained that she was "tired of being broke and she's tired of going week to week and not having our bills paid on time." He did not respond to her complaints because he could not get a point across unless he "scream[ed] and holler[ed]," so he just listened as she went "on and on." She was unhappy living "in the projects," and she wanted to know how she was going to get out of the projects "if I can't save no money."

¶ 13    At about 5 a.m., his wife told him that she was not going to go back to sleep and that he "might as well get up" with her and listen to what she was saying. He again told her that he was listening. Then she lit a cigarette, reached over, and burned him on the hand with the lit end. He brushed it off. She laughed, saying "I'm going to talk to you all night whether you like it or not" and telling him he was "not gonna get no sleep."

¶ 14    Although he kept telling her he loved her and that he would change, she did not believe him. He asked if they could just stop the argument so he could get some sleep. He told her that they could talk some more the next day, begging, "Just let me get a little sleep." The argument escalated. He had to "scream when he was talking"; various accusations were exchanged; he continued to suggest that they get some sleep.

¶ 15    They were still on the bed when he put his hands on her. "[S]he didn't want me to touch her so she pushed my hand up off of her and then she started pushing me *** then we got into an altercation where we was wrestling" and "she got to swinging on me." He "pushed her back just to let her know to calm down." She began hitting his face with her open hand because he was falling asleep and then "she started hitting me in my face with her fists" and he "tried to contain her by grabbin her hands." "She got up on her knees" and "was really trying to get on top of me so she can really try to hit me all in my face."

¶ 16    Defendant explained that he "just wanted to make her stop," so he grabbed both of her hands. She broke away and hit him again. Then he was up on his knees and he pushed her down on the bed on her back. He had her right arm pinned, but she was swinging at him with her left. At this point in the narrative, he demonstrated their positions with one of the detectives. He described how he held one of her arms but "she steady hitting me with that one."

¶ 17    Defendant said that "it was over in a matter of seconds," and then "a good three minutes after the fact that, you know what I'm saying, I was choking her. And then she just stopped

moving." "It just like another person was in me." "So after I'd say two minutes of just—no, around a good minute and good 15 seconds of straight force up around her neck, she was moving and stuff and then she just stopped moving." He checked her pulse and found none, so he put a pillow under her head and attempted CPR.

¶ 18      When he saw that it was time for the children to get up for summer school, he covered his wife's body. He was crying but did not want his children to see him in tears. He woke them and told them their mother was asleep and he would take them to school. When they were ready, he took them to his wife's mother's house where they regularly stayed before and after school. He went inside the house, but did not speak to anyone except to tell his mother-in-law that the children needed to brush their teeth because they had been out of toothpaste at home.

¶ 19      Defendant said that he went home. He did not go into the bedroom, but when he looked in and saw that his wife was "still in the same position," he "knew she was gone." He got in his car and began to drive around, crying. He called his sister Tiffany, and she asked if he had "killed that girl." He denied it. He told his sister that he and his wife were fighting and she told him to "take all my stuff out to my mom's house."

¶ 20      Eventually, he arrived at his mother's house. His sister Tiffany was there. He did not know what to do. He was too nervous to stand still. His mother was sleeping, but woke when he kissed her. He broke down in tears, telling his mother and sister that he had killed his wife. Then, because he did not want his mother to have "another heart attack," he changed his story to say he and his wife were just fighting.

¶ 21      He left in his car. He wanted to die. When he found a lake, he parked his car and got out because he was contemplating jumping in. He called his older sister Sharon and told her he had killed his wife. She kept him on the phone until eventually "something uplifted me not to do it." He realized that he could repent for killing his wife, but if he killed himself he would go "straight to hell."

¶ 22      Defendant got back in his car and began driving. His phone rang. It was his brother-in-law, who told him to turn himself in. They agreed to meet at a gas station, where he bought cigarettes and a pop. Then he followed his brother-in-law to the Harvey police station, where they were met by a friend of his brother-in-law, who walked him into the station where he told the police what had happened and was read his rights.

¶ 23      He explained that he was transported to the Robbins police department, because the crime had happened in Robbins. As he was in his cell that night, it "registered" that his wife was gone. He took his pants off, tied them in a knot, and tied it has high as he could on the cell bars. He said that he did not remember what happened next because he "fainted out," but when he woke he realized that God did not want him to die. He expressed sorrow for what he had done: "In the heat of the moment you do things that you don't want to do. *** I know it was wrong but it was an accident."

¶ 24      Dr. Valarie Arangelovich testified that she was a deputy medical examiner in the Cook County medical examiner's office. After defendant renewed his objection to her testimony and his objection was overruled, the parties stipulated to her status as an expert.

¶ 25      She explained that the autopsy of Latyonia Cook-Leach was conducted by Dr. Eupil

Choi, who had since retired. She stated that she had reviewed "the autopsy protocol, the toxicology reports, our investigator's report, and photographs" that documented Dr. Choi's external and internal examinations of the body.

¶ 26   She stated that the toxicology report was negative for cocaine or heroin. The victim's blood-alcohol concentration was 0.015, which she noted was well below 0.08, the legal limit for driving.

¶ 27   Asked by the State if she had formed an opinion, based on the review of these materials, as to the cause of death, she answered that she had formed an opinion and that the cause of death was strangulation and the manner of death was homicide. The basis for her conclusion included "marks on the neck," "bloody tinged fluid" in the trachea, and "hemorrhages in both eyes," which "means that there was some pressure placed on her neck which stopped her blood flow from going in and out of the brain."

¶ 28   Dr. Arangelovich testified based on her expertise as a forensic pathologist that an individual "can lose consciousness anywhere from 10 to 30 seconds once that pressure is applied; and then when the brain stops, everything else eventually stops, specifically the heart and the lungs." In "three to six minutes" "irreversible brain death" would occur. Further, the amount of pressure required to stop the flow of blood from the brain is "about 4.4 pounds." "[T]o stop nutrient rich blood from going *** to the brain *** about 11 pounds" of pressure is needed.

¶ 29   Asked whether the findings of the internal and external examination are "documented in the photographs," she answered, "Yes, they are." She then reviewed the autopsy photos and described the images to the court, including the hemorrhages in both eyes, a "rectangular bluish mark" on the right side of the victim's neck, which was referred to in the autopsy report, also another photo showing "multiple abrasions *** adjacent to that mark on the neck." These abrasions were not mentioned by Dr. Choi in the report, but were observed by Dr. Arangelovich from the photographs. She said that these abrasions were consistent with fingernail marks.

¶ 30   She also pointed to a photograph of "purple/red discoloration" in the front of the victim's neck, under her chin, and a photograph of the victim's face with "an abundant amount of white foamy fluid exuding from the nostrils." She explained that "because everything is being constricted here at the neck, the fluid in the trachea can't get down into the lungs, so it builds up, and eventually it's going to be out the path of least resistance, which would be up through the nostrils."

¶ 31   Another photograph showed the inside of the trachea, with "the red tinged fluid in the congested lining of the trachea" demonstrating "quite a bit of congestion in this area, which makes sense if there was pressure placed upon the neck, the blood isn't going to be able to be drained from the trachea. So again it's going to build up and eventually come out through her nose."

¶ 32   In conclusion, Dr. Arangelovich reiterated that she did not conduct the autopsy, but that she agreed with Dr. Choi's finding of strangulation.

¶ 33   On cross-examination, the doctor agreed that the autopsy report showed that the victim was 5 feet, 9½ inches tall and that she weighed 295 pounds. She acknowledged that she had

spoken to the State's Attorney before testifying and that she had read the police report. She had not spoken to defendant or viewed his videotaped statement. When defense counsel asked "so you don't know whether the basis that [the defendant] says is the cause of death is correct," she responded that she did not know "what [the defendant] is saying."

¶ 34    On redirect examination, Dr. Arangelovich stated that a person would lose consciousness after 10 to 30 seconds of strangulation, but could recover "depending on what their physical state of their heart and other organs are." Asked whether there were any problems with the victim's heart, she answered "No." Asked whether it would still require three to six minutes for a person with an impaired heart to die from strangulation, she answered "Correct."

¶ 35    On re-cross-examination, she again acknowledged that she had not personally examined the victim's heart and that the victim was obese, which would have been a "risk factor for developing heart disease," but that she was "only 29 years old."

¶ 36    On further redirect examination, she was asked if there was anything in the documented findings that would indicate that the victim could have died "after that 10 to 30 seconds." She answered that there was "nothing to indicate that."

¶ 37    After the State rested its case in chief, it sought to admit 46 exhibits numbered 1 through 47 (the number 30 was inadvertently not used). Defendant objected only to the admission of exhibit number 19, a bandage that was found near the victim's body. The court admitted all of the State's exhibits, including exhibit number 39, the four-page "Report of Postmortem Examination" and the attached "Results of Toxicologic Analyses," "Medical Examiner Case Report," and diagram of the body.

¶ 38    Defendant then moved for a directed verdict, arguing that the State's evidence failed to prove intent. The State responded that the four-hour delay between the killing and defendant's turning himself in gave him time to fabricate an explanation for his actions. Further, the expert testimony showed it would have taken three to six minutes of pressure from strangulation to result in the victim's death. Thus, the State argued, intent could be inferred from defendant's "keeping his hands around her throat" for that period of time.

¶ 39    The trial court denied the motion. Defendant chose not to testify.

¶ 40    In closing, the State asked the court to infer defendant's intent from his actions. During the altercation, he did not merely restrain his wife's arms to prevent her from hitting him. He put his hands around her throat and strangled her. Although he claims that her death was an accident, he did not call 9-1-1. Instead, he took his children to his mother-in-law's house as if it were a normal day. He did not notify the police of his wife's death until he was convinced by a family member to turn himself in. Turning to the expert testimony, the State argued that the victim would have been unconscious after 10 to 30 seconds of strangulation and would not have been able to fight back. Thereafter, in the at least three minutes it would have taken to cause her death, defendant would have known that his continuing to strangle her would create a grave risk of death or bodily harm.

¶ 41    Defense counsel argued that the crime scene was entirely consistent with defendant's version of events. The small amount of blood on the victim's mouth could have been the result of his trying to administer CPR. Counsel stated that he was "not contesting that the reason Latyonia Cook is dead is because Curtis choked her." Rather, he argued, even though

defendant's actions were likely to cause death or great bodily harm, he did not intend to kill her and he did not know that his actions could have caused such harm. At most, he acted recklessly after she incited a fight and would not let it drop. He was defending himself and, at most, was guilty of involuntary manslaughter.

¶ 42 In rebuttal, the State asked the court to reject any claim of self-defense, which would require that the defendant admit his intent to kill to defend himself. Because defendant never claimed that he was in fear for his life or that his wife tried to kill him, self-defense is not available to justify his actions.

¶ 43 The State also rebutted defendant's claim of mutual combat, arguing that mutual combat necessarily ends when one party withdraws. Even if the couple were engaged in mutual combat, she "withdrew" when she lost consciousness 10 to 30 seconds after he began to strangle her. His continuing to strangle her beyond that point was unjustified and unnecessary.

¶ 44 Finally, the State argued that there was no evidence of recklessness—that there is nothing reckless about placing one's hands around another's throat and choking that person until he or she is dead. Manual strangulation is "no accident." One might accidentally shoot or stab someone, because it takes only a second to do fatal harm, but one cannot accidentally strangle another person for three to six minutes, after that person is unconscious, without choosing to continue. "[H]e wanted her dead, and he wanted her dead for every second he kept his hands clamped around her throat."

¶ 45 The trial court found that the State did not meet its burden as to count I, intentional murder (720 ILCS 5/9-1(a)(1) (West 2002)), but found defendant guilty beyond a reasonable doubt of count II, knowing murder (720 ILCS 5/9-1(a)(2) (West 2002)), stating:

> "[T]he evidence is clear that the length of time that it had to be for the choking, that you knew that such strangling with your hand[s] created a strong probability of death or great bodily harm.
>
> I don't know if it is 15 seconds or three minutes or six minutes.
>
> I re-listened to your statement and an accident happens with a gun, an accident happens with a knife, an accident happens with a car, an accident happens with a lot of things like that.
>
> I don't see how an accident can happen with your hands. I don't see how that can happen.
>
> I think that you got extremely aggravated. I do know you're sorry about it after the fact. I think you got extremely aggravated, she may have made you aggravated."

¶ 46 Defendant filed a posttrial motion, in which he argued, *inter alia*, that the trial court erred by denying his motion to bar the testimony of Dr. Arangelovich. The posttrial motion did not raise any issue in connection with the admission of the autopsy report itself. At a subsequent hearing, the trial court denied defendant's motion to reconsider and his motion for a new trial. The trial court sentenced him to 28 years' imprisonment.

¶ 47 In affirming defendant's conviction, the appellate court began its analysis by stating that "[p]rior to trial, the defense moved *in limine* to bar the State from calling any forensic

pathologist, apart from Dr. Choi, to testify concerning Latyonia's postmortem examination as recorded in the autopsy protocol. The trial court denied the motion and overruled defense counsel's renewed objections to the evidence at trial as well as in defendant's posttrial motion. Hence, the claim of error was properly preserved for our consideration." 405 Ill. App. 3d at 304. The appellate court did not note, however, that defendant's motion *in limine* did not object to admission of the autopsy report, but only to the testimony of Dr. Arangelovich, or that he did not object to the admission of State's exhibit number 39, the autopsy report itself, or that he did not raise the issue of admission of the autopsy report in his posttrial motion.

¶ 48        Having found the issue properly preserved, the appellate court affirmed defendant's conviction. After citing *Crawford*, 541 U.S. at 68, for the proposition that business records are "[i]ncluded within that class of hearsay exemptions *** which the Court acknowledged as historically nontestimonial," the court concluded that, under *Crawford*, business records are excluded "from the scrutiny of the confrontation clause." 405 Ill. App. 3d at 305. Further, "[a]n unbroken line of precedent instructs that business records have been uniformly regarded as an exception to the hearsay rule." *Id.* For these reasons, the court concluded that admission of the autopsy report "did not implicate *Crawford*" because it was not testimonial in nature. *Id.* at 308. In addition, the appellate court concluded that the rule of *Crawford* was not implicated "where statements otherwise inadmissible as hearsay are used by experts for the purpose of explaining the bases for their opinions." *Id.* at 309. Finally, the court found the evidence in the record sufficient to support the trial court's verdict. *Id.* at 318.

¶ 49                                              ANALYSIS

¶ 50        Defendant raises three issues on appeal. First, he argues that the admission of Dr. Arangelovich's testimony recounting Dr. Choi's autopsy findings violated the confrontation clause because these findings were admitted for their truth, not simply for the purpose of explaining the basis for her opinion. Second, he argues that admission of the autopsy report itself into evidence violated his rights under the confrontation clause because he did not have the opportunity to cross-examine Dr. Choi. Third, he argues that even if this evidence was properly admitted, the evidence at trial was insufficient to convict him of knowing murder.

¶ 51                        A. Admission of Testimony of Dr. Arangelovich

¶ 52        Defendant has abandoned the argument that Dr. Arangelovich should not have been allowed to testify at all. Instead, defendant now challenges only that portion of Dr. Arangelovich's testimony that recounted the contents of the autopsy report. He distinguishes her testimony from that in cases in which an expert has been allowed to recount the results of laboratory tests performed by machines because autopsy findings are "purely a product of human agency, perception, observation, and subjective interpretation, not raw data generated by a neutral, objective machine." In support of this argument, he cites *United States v. Washington*, 498 F.3d 225 (4th Cir. 2007), and other cases for the proposition that expert testimony recounting results of toxicology testing does not violate the right of confrontation because such test results are generated by a neutral, objective machine, rather than a human

agent. *Washington* does not assist our analysis. The court's finding that raw data generated by a machine do not constitute statements and that machines are not declarants (*id.* at 231) does not offer any insight on the question of whether an expert witness who recounts the results of an autopsy report is introducing testimonial hearsay.

¶ 53        Defendant also argues that Dr. Arangelovich "parroted" Dr. Choi's autopsy findings on direct examination by essentially reading his autopsy report verbatim into the record, in the guise of expert opinion. This error, he asserts, was amplified by her testimony that she "agreed" with Dr. Choi's conclusions, which were offered for their truth. He quotes a passage from *United States v. Pablo*, 625 F.3d 1285, 1292 (10th Cir. 2010): "If an expert simply parrots another individual's testimonial hearsay, rather than conveying her independent judgment that only incidentally discloses testimonial hearsay ***, then the expert is, in effect, disclosing the testimonial hearsay for its substantive truth and she becomes little more than a backdoor conduit for otherwise inadmissible testimonial hearsay." However, since defendant's brief was filed, the United States Supreme Court has vacated the judgment in that case and remanded it for reconsideration in light of *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality op.). We, therefore, find it unnecessary to consider this case or the others cited by defendant for this argument.

¶ 54        In response, the State argues that Dr. Arangelovich's testimony, even when she referred to the contents of the autopsy report, was not hearsay. She "made clear that she was testifying to her own opinions," which were based on information gleaned from review of autopsy photographs as well as the autopsy report. Although she agreed with Dr. Choi's conclusions as to the cause and manner of death, she reached her own conclusions, and she was subject to cross-examination.

¶ 55        In *Williams*, the Court was asked to determine the constitutionality of allowing an expert witness to testify regarding the results of a DNA test that she did not perform as the basis for her opinion that the defendant's DNA matched the test results. A plurality of the Court concluded that an expert may recount out-of-court statements for the limited purpose of explaining the assumptions upon which her opinion is based without implicating the confrontation clause. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228.

¶ 56        However, in *Williams*, the "report itself was neither admitted into evidence nor shown to the factfinder." The expert witness "did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed." *Id.* at ___, 132 S. Ct. at 2230.

¶ 57        In the present case, not only did the testimony of an expert witness include the contents of the autopsy report, the report itself was admitted into evidence. Thus, if admission of the report was error because the report was testimonial in nature, the expert's testimony may have compounded that error. However, if the report was properly admitted, the expert witness's testimony cannot have violated the confrontation clause even if it had the effect of offering the report for the truth of the matters asserted therein.

¶ 58                            B. Admission of Autopsy Report

¶ 59        In his petition for leave to appeal, defendant argued that leave should be granted "to resolve whether a medical examiner's autopsy report, prepared for use in a criminal

-10-

prosecution, is 'testimonial' evidence subject to the demands of the Confrontation Clause." However, our review of the record reveals that defendant's motion *in limine* did not seek to exclude admission of the autopsy report. Further, he neither objected to its admission when the State moved for admission of its exhibit number 39, nor did he raise the issue of admissibility of the autopsy report in his posttrial motion.

¶ 60    A defendant is not entitled to review of a claimed error unless he has made a timely objection at trial and raised the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Under the plain-error rule, codified in Supreme Court Rule 615, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded" unless the appellant demonstrates plain error. Ill. S. Ct. R. 615. A reviewing court will find plain error and grant relief only when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 61    If a defendant fails to make a plain-error argument, we generally honor his procedural default (*People v. Ramsey*, 239 Ill. 2d 342, 412 (2010)), because a defendant who fails to argue for plain-error review when he has forfeited review of an issue "obviously cannot meet his burden of persuasion" that one of the two prongs of the plain-error rule is satisfied (*People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010)). However, a party's failure to preserve a specific issue is not a jurisdictional bar to our review of the question. *In re Rolandis G.*, 232 Ill. 2d 13, 37 (2008). For example, we may exercise our discretion to review an otherwise forfeited issue when it is inextricably intertwined with other issues properly before the court. *Id.*

¶ 62    In the present case, we choose to address the question presented by defendant for several reasons. First, the State has not argued forfeiture. Second, the resolution of the issue that defendant properly preserved is dependent on the resolution of the issue he forfeited. And third, the issue implicates a fundamental constitutional right (*People v. Campbell*, 208 Ill. 2d 203, 211 (2003)) and is in need of resolution by this court.

¶ 63    Resolution of a claim under *Crawford* requires a court to answer a series of questions: (1) Was the out-of-court statement hearsay because it was offered for the truth of the matters asserted therein? (2) If hearsay, was the statement admissible under an exception to the hearsay rule? (3) If admissible hearsay, was the statement testimonial in nature? and (4) If testimonial, was admission of the statement reversible error?

¶ 64    Our review is *de novo* because a defendant's claim that his sixth amendment right to confront a witness against him was violated presents a question of law. *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009).

¶ 65                    *Autopsy Report As Hearsay Evidence*

¶ 66    An out-of-court statement is hearsay and thus subject to the limits of the hearsay rule if it is "a statement, other than one made by the declarant while testifying at the trial or hearing,

-11-

offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011).[1] The term "statement" includes written as well as oral assertions. Ill. R. Evid. 801(a) (eff. Jan. 1, 2011).

¶ 67    In the present case, because the report was admitted into evidence without limitation, we find that it was admitted for the truth of the matters asserted therein.

¶ 68    *Admission of Autopsy Report Under Exceptions to the Hearsay Rule*

¶ 69    Even though the autopsy report was admitted for a hearsay purpose, its admission may have been proper under either of two well-established exceptions to the hearsay rule, provided a proper foundation was laid.

¶ 70    Rule 803(6) applies to records of regularly conducted activities if kept in the normal course of business, "but not including in criminal cases medical records." Ill. R. Evid. 803(6) (eff. Jan. 1, 2011). Rule 803(8) codifies the long-standing hearsay exception for records "of public offices or agencies, setting forth *** matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, police accident reports and in criminal cases medical records and matters observed by police officers and other law enforcement personnel." Ill. R. Evid. 803(8) (eff. Jan. 1, 2011). Both rules apply unless the sources of information or the method or circumstances of preparation of the record indicate a lack of trustworthiness. Ill. R. Evid. 803(6), 803(8) (eff. Jan. 1, 2011).

¶ 71    Defendant has not argued that an autopsy report is a "medical record," and our research reveals no cases in which it has been deemed such. The deceased person brought to the medical examiner's office for determination of cause of death is not a patient and the medical examiner, although she is trained as a physician, is not the deceased person's doctor.

¶ 72    Even aside from these common law exceptions to the hearsay rule, now codified in our Rules of Evidence, reports of autopsies "kept in the ordinary course of business of the coroner's office" and "duly certified" are admissible "[i]n any civil or criminal action" pursuant to state statute. 725 ILCS 5/115-5.1 (West 2002). Such records "shall be public documents" and, thus, an autopsy report "may be duly admitted into evidence as an exception to the hearsay rule as prima facie proof of the cause of death of the person to whom it relates." *Id.* The statute provides that either party may subpoena the person who prepared the autopsy report, and if that individual is deceased, "a duly authorized official of the coroner's office may testify" to that fact and to the fact that "the offered report or record was prepared by such deceased person." *Id.* The testifying witness must also attest that the report "was prepared in the ordinary and usual course of the deceased person's duty or employment." *Id.*

¶ 73    The statute does not address the situation where the individual who prepared the report has retired or left the employment of the coroner's office. However, the statute does state that a duly certified report is admissible and that the individual who prepared it "may be" subpoenaed, not that the report is inadmissible if he does not testify.

---

[1]The Illinois Rules of Evidence, adopted by this court effective January 1, 2011, codify the preexisting common law rules of evidence.

¶ 74	The State argues that the report was admissible under either or both of these exceptions to the hearsay rule. Defendant does not dispute this point, concentrating his argument on whether the autopsy report was testimonial hearsay.

¶ 75	We find that the autopsy report was admissible under either or both of these exceptions to the hearsay rule and under state statute.

¶ 76	*Autopsy Report As Testimonial Hearsay*

¶ 77	In *Crawford*, the Supreme Court held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford*, 541 U.S. at 68-69. Specifically, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. Because the hearsay statements at issue in that case were "testimonial under any definition" (*id.* at 61), the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial' " (*id.* at 68).

¶ 78	The Court did, however, give some guidance as to what types of statements might come within the definition of "testimonial." "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. However, most of the hearsay exceptions that developed at common law "covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Id.* at 56.

¶ 79	The appellate court characterized this comment as "*Crawford*'s exclusion of business records from the scrutiny of the confrontation clause." 405 Ill. App. 3d at 305. This is a misreading of *Crawford*.

¶ 80	*Crawford* did not establish that business records are, in every case, nontestimonial. Rather, the Court said that "there is scant evidence that exceptions [to the hearsay rule] were invoked" in the early days of this country "to admit *testimonial* statements against the accused in a *criminal* case." (Emphases in original.) *Crawford*, 541 U.S. at 56. Rather, "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."[2] *Id.*

¶ 81	The Court was suggesting that the new rule it was adopting was not going to entirely replace "the Framers' design to afford the States flexibility in their development of hearsay law" (*id.* at 68) by including every hearsay statement that might be admitted against a criminal defendant within the scope of the new rule. As an example of the continuing vitality of traditional hearsay exceptions, the Court merely noted in *Crawford* that business records

---

[2]Under both federal and state rules of evidence, "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay." Fed. R. Evid. 801(d)(2); Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011). Such a statement is not hearsay because it is not offered for the truth of the matter asserted by the speaker, but rather to demonstrate the existence of and the object of the conspiracy. A statement in furtherance of a conspiracy cannot be testimonial hearsay because it is not hearsay.

-13-

will rarely implicate the confrontation clause because they are prepared in the routine course of the operation of the business activity or public office or agency, rather than for the purpose of admission against a criminal defendant.[3] This does not mean, however, that a business record or public record can never be testimonial.

¶ 82    In subsequent cases, the Court has further clarified what makes an out-of-court statement "testimonial" in nature. In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Court distinguished between two types of statements that might be made to a police officer. One category of statement is nontestimonial; the other is testimonial:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

¶ 83    The Court recognized that the last clause in its holding—"that the purpose *** is to establish or prove past events potentially relevant to later criminal prosecution"—could apply to out-of-court statements that were not made during police interrogations. It limited its holding in this way because the statements at issue in *Davis* were made during police interrogations. However, in a footnote, the Court stated that it did not mean to "imply *** that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 822 n.1.

¶ 84    Justice Thomas objected to the majority's primary purpose test as unpredictable. *Id.* at 834 (Thomas, J., concurring in the judgment in part and dissenting in part). In his view, out-of-court statements that lack "some degree of solemnity" are not testimonial in nature. *Id.* at 836. He would find affidavits, depositions, prior testimony, and confessions sufficiently solemn "to constitute formalized statements" subject to the rule of *Crawford*. *Id.* at 836-37.

¶ 85    At this point in the evolution of the *Crawford* line of cases, eight members of the Court endorsed a primary purpose test to determine whether an out-of-court statement is testimonial.

¶ 86    In the next case to reach the Court, the issue was whether a certificate from a state laboratory attesting that the substance analyzed was cocaine was testimonial hearsay when offered in evidence against a defendant charged with drug distribution and trafficking. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

¶ 87    In this case, the State offered several bases for excluding such certificates from the scope of the *Crawford* rule, including: the individuals who conduct such analyses are not "accusatory" witnesses; statements in the certificates are obtained by neutral, scientific testing; and the certificates are akin to official and business records.

---

[3]Other examples of such traditional hearsay exceptions are the exceptions for marriage, baptismal, or similar certificates (Fed. R. Evid. 803(12); Ill. R. Evid. 803(12) (eff. Jan. 1, 2011)), for which it is difficult to imagine a testimonial purpose for their creation.

¶ 88    The Court rejected each of these arguments. First, a witness need not directly accuse the defendant to be a witness "against" him within the meaning of the sixth amendment. Any witness for the prosecution is a witness against a defendant. There is not a "category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id.* at 314.

¶ 89    Second, with regard to excluding the results of forensic testing from the scope of the *Crawford* rule, the Court noted that "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Id.* at 319. Thus, forensic test results are not to be treated differently from other types of out-of-court statements on the basis that they are somehow more reliable. This argument "is little more than an invitation to return to" the rule of *Ohio v. Roberts*, 448 U.S. 56 (1980), which *Crawford* overruled. *Melendez-Diaz*, 557 U.S. at 317.

¶ 90    Third, the Court held that the laboratory reports, while they may be similar in some respects to business and official records admissible under a hearsay exception at common law, are not admissible without confrontation. *Id.* at 321. The Court stated that such sworn certificates do "not qualify as traditional official or business records, and even if they did, their authors would be subject to confrontation nonetheless." *Id.* The hearsay exception for documents or records prepared in the regular course of business does not apply "if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321-22 (citing Fed. R. Evid. 803(8) (defining pubic records as "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel")).

¶ 91    The Court then clarified its earlier statement in *Crawford* regarding business and official records:

> "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Id.* at 324.

¶ 92    In *Melendez-Diaz*, the forensic testing on the substance taken from the defendant at the time of his arrest was performed for the specific purpose of determining whether the substance was cocaine so that the results of the test could be used in a later criminal prosecution. Thus, the Court concluded, although the analysts' statements might "qualify as business or official records," they were prepared specifically for use in a criminal trial and were, therefore, "testimony against" the defendant and subject to confrontation. *Id.* at 324.

¶ 93    The majority opinion found "little doubt" that the certificates fell within the "core class of testimonial statements" described in *Crawford*. *Id.* at 310. The certificates were "quite plainly affidavits" and were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Id.* at 310-11 (quoting *Davis*, 547 U.S. at 830). The opinion emphasized that the purpose, indeed the *sole purpose* of the affidavits[,] was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." (Emphasis in original.) *Id.* at 311 (quoting Mass. Gen. Laws ch. 111, § 13).

¶ 94    Justice Thomas again concurred, distancing himself from consideration of the purpose of the out-of-court statement and repeating his position that the confrontation clause is

implicated only by extrajudicial statements that are " 'contained in formalized testimonial materials.' " *Id.* at 329 (Thomas, J., concurring) (quoting *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in the judgment, joined by Scalia, J.)).

¶ 95 Justice Kennedy wrote in dissent, joined by three other justices. (These four would go on to form the plurality in *Williams*.) The dissenters concluded that laboratory technicians who perform forensic tests are not "witnesses" against a defendant because their reports reflect near contemporaneous observations of the test itself, not recollections of past events. *Id.* at 345 (Kennedy, J., dissenting, joined by Roberts, C.J., and Breyer and Alito, JJ.). The dissent contrasted such contemporary observations with the statements at issue in *Davis*, where the Court distinguished between two types of witness statements based on their primary purpose. *Id.* In contrast, recording an observation at the time it is made is not an act of witnessing, according to the dissent. *Id.* The dissent noted further that the technician who prepares a forensic laboratory report "observes neither the crime nor any human action related to it"; thus, he is "not a witness against the defendant in the conventional sense." *Id.* Finally, the dissent took exception to the Court's use of the term "testimonial" as the basis for determining whether an out-of-court statement is subject to the confrontation clause when the clause itself refers to witnesses, not to statements. *Id.* at 346.

¶ 96 The dissent did not reject the primary purpose test that until this time had eight subscribers on the Court, but did state that the Court had transformed a mere turn of phrase, "testimonial statement," "into a new and sweeping legal rule, by holding that anyone who makes a formal statement for the purpose of later prosecution—no matter how removed from the crime—must be considered a 'witness against' the defendant." *Id.*

¶ 97 In *Michigan v. Bryant*, 562 U.S. ___,131 S. Ct. 1143 (2011), the out-of-court statements at issue were made by the victim of a shooting to the police officers who responded to the call. The victim identified the man who shot him and described the circumstances of the shooting. He died within hours. *Id.* at ___, 131 S. Ct. at 1150. At the murder trial of the individual identified by the victim, the victim's statements to police were admitted into evidence under the excited utterance exception to the hearsay rule. *Id.* at ___, 131 S. Ct. at 1151. The Supreme Court of Michigan concluded that the statements were obtained by police questioning for the primary purpose of establishing the facts of an event that had already occurred, not to enable the police to deal with an ongoing emergency. *Id.* at ___, 131 S. Ct. at 1151. Thus, the court concluded that the statements were testimonial in nature and their admission violated the confrontation clause. The state supreme court reversed the conviction and ordered a new trial. *Id.* at ___, 131 S. Ct at 1151.

¶ 98 Writing for five justices (Justice Kagan did not participate), Justice Sotomayor recounted *Crawford* and its progeny, including the primary purpose test announced in *Davis*. *Id.* at ___, 131 S. Ct. at 1154. The majority reaffirmed the test, stating clarification was necessary because the facts of this case presented a "new context" for its application. *Id.* at ___, 131 S. Ct. at 1156.

¶ 99 Determining whether the primary purpose of an interrogation of a witness by the police is to enable the police to respond to an ongoing emergency requires an "objective[ ] evaluat[ion of] the circumstances in which the encounter occurs and the statements and

actions of the parties." *Id.* at ___, 131 S. Ct. at 1156. "That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at ___, 131 S. Ct. at 1156. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at ___, 131 S. Ct. at 1158.

¶ 100    When police respond to a call reporting a shooting, the "threat to the first responders and public may continue." *Id.* at ___, 131 S. Ct. at 1158. In addition, "the duration and scope of an emergency may depend in part on the type of weapon employed." *Id.* at ___, 131 S. Ct. at 1158. The existence of a medical emergency is also relevant. *Id*. at ___, 131 S. Ct. at 1158. The majority acknowledged that interrogation of a witness on the scene of an emergency may evolve into the collection of a testimonial statement (*id.* at ___, 131 S. Ct. at 1159), and that formality is not the "sole touchstone" of the primary purpose inquiry (*id.* at ___, 131 S. Ct. at 1160). However, whether an ongoing emergency exists when the police obtain a statement from a witness is "simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at ___, 131 S. Ct. at 1160. "Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is also the approach most consistent with our past holdings." *Id.* at ___, 131 S. Ct. at 1162.

¶ 101    Applying these principles to the facts, the majority concluded that "there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown," and a mortally wounded victim was found near the site of the shooting and within minutes thereafter. *Id.* at ___, 131 S. Ct. at 1164. The officers asked questions necessary to allow them to assess the situation, including threats to their own safety and the safety of the victim. *Id.* at ___, 131 S. Ct. at 1166. These initial inquiries "resulted in the type of nontestimonial statements" contemplated in *Davis*. *Id.* at ___, 131 S. Ct. at 1166. Finally, the situation was informal, lacking any circumstances that would have alerted the victim that his statements might be used in a future prosecution. *Id.* at ___, 131 S. Ct. at 1166. Thus, the circumstances objectively indicated that the primary purpose of the police questioning was to enable the police to meet an ongoing emergency, and the victim's statements to police were not testimonial in nature. *Id.* at ___, 131 S. Ct. at 1166-67.

¶ 102    Justice Thomas concurred in the judgment, again on the basis that the statements at issue "lacked sufficient formality and solemnity" to be considered testimonial. *Id.* at ___, 131 S. Ct. at 1167 (Thomas, J., concurring in the judgment).

¶ 103    Justice Scalia dissented, joined by Justice Ginsburg. He did not entirely reject the primary purpose test that he set out in *Davis*, which referred to the purpose "of the interrogation" (*Davis*, 547 U.S. at 822); rather, he objected to the majority's application of the test. In his opinion, the primary purpose inquiry should actually focus on the declarant's purpose in making the statement, not on the purpose of the police in soliciting it. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1169 (Scalia, J., dissenting). In this case, from the victim's perspective, "his statements had little value except to ensure the arrest and eventual prosecution" of the defendant. *Id.* at ___, 131 S. Ct. at 1170.

¶ 104    Justice Ginsburg agreed with this position, but wrote separately to opine that even if the interrogators' intent were considered, as instructed by *Davis*, the victim's statements in this case would be testimonial. *Id.* at ___, 131 S. Ct. at 1176 (Ginsburg, J., dissenting).

¶ 105    A scorecard may be useful at this point. After *Bryant*, eight members of the Court endorsed a primary purpose test when the out-of-court statement at issue was made by a witness or a victim to the police (*Davis*); they disagreed as to whether the test should be applied from the perspective of the declarant (the *Bryant* dissenters) or based on a consideration of all circumstances, including the intent of the interrogators (the *Bryant* majority). Four justices applied a purpose test when the out-of-court statement was a report of forensic testing (*Melendez-Diaz* plurality), while four found it unnecessary to apply the test because the declarants were not "witnesses" against the accused (*Melendez-Diaz* dissent). Justice Thomas has consistently maintained his position that the test to determine whether an out-of-court statement is testimonial is the degree of solemnity and formality with which it was made.

¶ 106    Next, in *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), the Court considered whether a defendant in a prosecution for driving while under the influence of intoxicating liquor had the right under the sixth amendment to confront the analyst who certified the blood-alcohol analysis report. *Id.* at ___, 131 S. Ct. at 2710. The State had admitted the test results through the testimony of a scientist other than the one who performed the test.

¶ 107    *Bullcoming* was another divided opinion. Justice Ginsburg wrote for the majority, but Justices Thomas and Kagan joined only in part; Justice Sotomayor joined in part and filed a separate opinion concurring in part. Justice Kennedy filed a dissent, joined by Chief Justice Roberts and Justices Breyer and Alito. (These four dissenters would go on to become the plurality in *Williams*.)

¶ 108    The majority opinion described *Melendez-Diaz* as standing for the proposition that a forensic laboratory report created "specifically to serve as evidence in a criminal proceeding" is testimonial for purposes of the confrontation clause. *Id.* at ___, 131 S. Ct. at 2709. Thus, a forensic laboratory report "containing a testimonial certification" of a defendant's blood-alcohol concentration, "made for the purpose of proving a particular fact" at trial, is testimonial. *Id.* at ___, 131 S. Ct. at 2710. In a footnote, the majority quoted the language from *Davis* regarding the "primary purpose" of an out-of-court statement. *Id.* at ___ n.6, 131 S. Ct. at 2714 n.6.

¶ 109    As applied to the facts of this case, the blood-alcohol test results were testimonial in nature because the report was "created solely for an 'evidentiary purpose' *** in aid of a police investigation." *Id.* at ___, 131 S. Ct. at 2717 (quoting *Melendez-Diaz*, 557 U.S. at ___, 129 S. Ct. at 2532). The absence of formal certification or notarization did not remove this report from the scope of the confrontation clause, because the formalities attending the creation of the report and its purpose were "more than adequate" to classify it as testimonial. *Id.* at ___, 131 S. Ct. at 2717.

¶ 110    Justice Sotomayor wrote separately "to highlight" her opinion that the "primary purpose " test should govern the question of whether a particular scientific report is testimonial. *Id.*

at ___, 131 S. Ct. at 2719-20 (Sotomayor, J., concurring in part). The report at issue in this case had no alternate purpose, let alone an alternate primary purpose, other than to serve as evidence at trial. *Id.* at ___, 131 S. Ct. at 2722. Further, the formality of its certification suggested its evidentiary purpose. *Id.* at ___, 131 S. Ct. at 2721. Thus, "[a]s in *Melendez-Diaz*, the primary purpose of the BAC report [was] clearly to serve as evidence. It is therefore testimonial ***." *Id.* at ___, 131 S. Ct. at 2723.

¶ 111    Justices Thomas and Kagan joined the opinion in part. Neither joined part IV of the opinion, which discussed whether complying with the holding of this case would unduly burden prosecutions. In addition, Justice Thomas did not join footnote 6, which defined "testimonial" using the primary purpose test set out in *Davis*.

¶ 112    The dissenting justices opined that it was a mistake to extend the holding of *Melendez-Diaz* to cases in which "a knowledgeable representative of the laboratory was present to testify and to explain the lab's processes and the details of the report." *Id.* at ___, 131 S. Ct. at 2723 (Kennedy, J., dissenting, joined by Roberts, C.J., and Breyer and Alito, JJ.). The dissent would have distinguished between a document that is quite plainly an affidavit, such as the report at issue in *Melendez-Diaz*, and a routine test result generated by a scientific laboratory. *Id.* at ___, 131 S. Ct. at 2724. The dissent does not mention the primary purpose test, either to endorse or reject it.

¶ 113    Thus, after *Bullcoming*, the primary purpose test had been accepted in some form by every member of the Court except Justice Thomas. The test had been applied to two categories of out-of-court statements: statements made by witnesses to the police and statements contained in reports of forensic testing.

¶ 114    Most recently, in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012), the Supreme Court considered whether *Crawford* bars an expert from expressing an opinion based on facts gleaned from a laboratory report when she lacked firsthand knowledge regarding the preparation of the report. The hearsay evidence at issue in *Williams* was a DNA profile prepared by an outside laboratory using vaginal swabs collected from the victim of a crime.

¶ 115    Justice Alito wrote the plurality opinion, joined by Justices Roberts, Kennedy, and Breyer. These four justices were the dissenters in *Melendez-Diaz* and *Bullcoming*, the two previous cases involving forensic test results. Justice Breyer wrote separately to restate the position of their earlier dissents. Justice Thomas concurred in the judgment, maintaining his position that formality and solemnity are the hallmarks of a testimonial statement. Finally, Justice Kagan's dissent was joined by Justices Scalia, Ginsburg, and Sotomayor.

¶ 116    The plurality concluded that the expert's testimony was not barred. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2240. Then the plurality went on to consider whether admission of the actual DNA profile for its truth would have violated the confrontation clause. *Id.* at ___, 132 S. Ct. at 2242.

¶ 117    The plurality noted that in *Crawford*, *Melendez-Diaz*, and *Bullcoming*, the confrontation clause was violated by the admission of evidence that shared two characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id.* at ___, 132 S. Ct. at 2242. In

all but one of the post-*Crawford* cases finding a confrontation violation both of these characteristics were present. In *Hammon v. Indiana*, 547 U.S. 813, 829-32 (2006), the companion case to *Davis*, an informal statement that was elicited in the course of the police interrogation was found to be testimonial in nature. However, in every case, including *Hammon*, the "statement at issue had the primary purpose of accusing a targeted individual." *Id.* at ___, 132 S. Ct. at 2243.

¶ 118    Thus, the plurality concluded in *Williams* that not all forensic reports offered by the State are testimonial statements. Rather, the forensic reports at issue in *Melendez-Diaz* and *Bullcoming* "ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." *Id.* at ___, 132 S. Ct. at 2243. In contrast, the DNA report at issue in *Williams* "plainly was not prepared for the primary purpose of accusing a targeted individual." *Id.* at ___, 132 S. Ct. at 2243. Indeed, the defendant "was neither in custody nor under suspicion" when the vaginal swabs from the victim were sent to the outside laboratory for testing. *Id.* at ___, 132 S. Ct. at 2243.

¶ 119    In *Williams*, unlike the present case, the disputed report was not itself admitted into evidence. Nevertheless, the plurality concluded in "a second, independent basis for [its] decision" (*id.* at ___, 132 S. Ct. at 2228) that "[e]ven if the *** report had been introduced for its truth, we would nevertheless conclude that there was no Confrontation Clause violation" (*id.* at ___, 132 S. Ct. at 2242). The challenged DNA report was not prepared for the purpose of accusing the defendant, who was not in custody or even under suspicion at the time the test was performed. *Id.* at ___, 132 S. Ct. at 2243. The technicians conducting the test and preparing the report had "no incentive to produce anything other than a scientifically sound and reliable profile." *Id.* at ___, 132 S. Ct. at 2244. Further, they could not have known whether the results they reported would be used to incriminate or exonerate an individual. *Id.* at ___, 132 S. Ct. at 2244. In addition, because multiple individuals participate in the process of DNA testing, "it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Id.* at ___, 132 S. Ct. at 2244. Finally, where DNA test results are concerned, the testimony showed that an expert witness would be able to tell by looking at the test results if the sample had been degraded or contaminated. *Id.* Indeed, the possibility that "shoddy lab work" would produce a profile that was a "precise genetic" match to an individual later picked out of a lineup by the victim is "beyond fanciful." *Id.* at ___, 132 S. Ct. at 2244.

¶ 120    When we must determine whether a forensic report is testimonial in nature, the *Williams* plurality instructs us to apply an objective test, looking for "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Id.* at ___, 132 S. Ct. at 2243. If this inquiry reveals that the forensic report was "made for the purpose of proving the guilt of a particular criminal defendant at trial" (*id.* at ___, 132 S. Ct. at 2243), it is testimonial.

¶ 121    The *Williams* dissent rejects this focus on the targeting of a particular individual, reminding us that *Davis* formulated the test as whether the out-of-court statement was "made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence." *Id.* at ___, 132 S. Ct.

at 2273 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.) (quoting *Davis*, 547 U.S. at 822). The dissent accuses the plurality of adopting, without explanation, a new formulation of the primary purpose test when forensic testing is involved, asking whether the report was prepared "for the primary purpose of accusing a targeted individual." *Id.* at ___, 132 S. Ct. at 2273.

¶ 122    We conclude that whichever definition of primary purpose is applied, the autopsy report in the present case was not testimonial because it was (1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case.

¶ 123    Defendant argues that the objective circumstances of the present case show that the autopsy report prepared by Dr. Choi was testimonial. The medical examiner case report, which is a form attached to the autopsy report, states the body was found by Officer M. Evans, who had responded to a call from the victim's mother asking that the police check on the well-being of her daughter. She was concerned because her son-in-law had called her and told her that he had "done something to his wife." Evans reported that he and another officer contacted the manager at the housing complex and obtained entry to the apartment "where they discovered the subject lying in bed unresponsive." In addition, Detective T. Franklin was interviewed and he "related that the subject's husband is now in custody and admitted choking his wife."[4]

¶ 124    Defendant argues that because Dr. Choi was performing an autopsy "at the police's request in the midst of a criminal investigation into a violent death where a suspect had been arrested for homicide, [he] had every reason to expect that his autopsy report on Latyonia could be used as evidence in a later criminal trial."

¶ 125    The State responds that the medical examiner's office is not engaged in "the production of evidence for use at trial" (*Melendez-Diaz*, 557 U.S. at 321) but, rather, in the determination of the cause and manner of death when an individual dies under certain specified circumstances. The medical examiner's office is not a law enforcement agency and it does not conduct autopsies and prepare autopsy reports with the primary purpose of their being used as evidence in future criminal trials of targeted individuals. Even if Dr. Choi knew or suspected that his report in this case would likely be used in a future criminal trial, his function was not "the production of evidence for use at trial."

¶ 126    We agree. Under state law, as soon as a coroner "knows or is informed that the dead body of any person is found, or lying within his county, *** [he] shall *** take charge of the same and shall make a preliminary investigation into the circumstances of the death" if any one of five enumerated conditions exists. 55 ILCS 5/3-3013 (West 2010). One such condition is that the death was "sudden or violent death, whether apparently suicidal, homicidal or accidental." 55 ILCS 5/3-3013(a) (West 2010). Further, even when the police suspect foul

---

[4]Defendant also asserts that a "copy of the police report documenting the criminal investigation into Latyonia's death also was sent to the medical examiner with Latyonia's body." However, the portion of the record that he cites for this assertion is State's exhibit number 39, which is the autopsy report and attached forms, none of which is a police report.

play and the medical examiner's office is aware of this suspicion, an autopsy might reveal that the deceased died of natural causes and, thus, exonerate a suspect. For example, an autopsy of an apparent victim of a crime could reveal that the cause of death was a ruptured congenital brain aneurysm and that the physical altercation was not a contributing cause.

¶ 127    In the present case, although the police discovered the body and arranged for transport, there is no evidence that the autopsy was done at the specific request of the police. The medical examiner's office performed the autopsy pursuant to state law, just as it would have if the police had arranged to transport the body of an accident victim.

¶ 128    The statute also requires that when the coroner or medical examiner determines that the cause of death is homicide, he shall withdraw certain specimens from the body and shall deliver these specimens to the Illinois State Police, Division of Forensic Services, "in addition to any other findings, specimens, or information that [he] is required to provide during the conduct of a criminal investigation." 55 ILCS 5/3-3013 (West 2010).

¶ 129    Thus, Dr. Choi, as the assistant medical examiner assigned to this case, was required by law to prepare a report and to submit that report, along with other items, to the police. Although he was aware that the victim's husband was in custody[5] and that he had admitted to "choking" her, his examination could have either incriminated or exonerated him, depending on what the body revealed about the cause of death. See *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228. In short, Dr. Choi was not acting as an agent of law enforcement, but as one charged with protecting the public health by determining the cause of a sudden death that might have been "suicidal, homicidal or accidental." 55 ILCS 5/3-3013 (West 2010).

¶ 130    Further, while it is true that an autopsy report might eventually be used in litigation of some sort, either civil or criminal, these reports are not usually prepared for the sole purpose of litigation. A finding of accidental death may eventually lead to claims of product liability, medical malpractice, or other tort. A finding of suicide may become evidence in a lawsuit over proceeds of a life insurance policy. Similarly, a finding of homicide may be used in a subsequent prosecution of the accused killer. But the primary purpose of preparing an autopsy report is not to accuse "a targeted individual of engaging in criminal conduct" (*Williams*, 567 U.S. at ___, 132 S. Ct. at 2242) or to provide evidence in a criminal trial (*Davis*, 547 U.S. at 822). An autopsy report is prepared in the normal course of operation of the medical examiner's office, to determine the cause and manner of death, which, if determined to be homicide, could result in charges being brought.

¶ 131    And, unlike the forensic report at issue in *Melendez-Diaz*, the autopsy report was not certified or sworn in anticipation of its being used as evidence; it was merely signed by the doctor who performed the autopsy. (Thus, the autopsy report would not be deemed testimonial by Justice Thomas, because it lacks the formality and solemnity of an affidavit, deposition, or prior sworn testimony.)

¶ 132    In the present case, the autopsy report did not bear testimony against the defendant. Nothing in the report directly linked defendant to the crime. Unlike a DNA test which might

---

[5]The record does not indicate that defendant was under arrest when the body of the victim was brought to the medical examiner's office, although he was in custody at that time.

identify a defendant as the perpetrator of a particular crime, the autopsy finding of homicide did not directly accuse defendant. Only when the autopsy findings are viewed in light of defendant's own statement to the police is he linked to the crime. In short, the autopsy sought to determine how the victim died, not who was responsible, and, thus, Dr. Choi was not defendant's accuser.

¶ 133    Finally, as a practical matter, because a prosecution for murder may be brought years or even decades after the autopsy was performed and the report prepared, these reports should be deemed testimonial only in the unusual case in which the police play a direct role (perhaps by arranging for the exhumation of a body to reopen a "cold case") and the purpose of the autopsy is clearly to provide evidence for use in a prosecution. The potential for a lengthy delay between the crime and its prosecution could severely impede the cause of justice if routine autopsies were deemed testimonial merely because the cause of death is determined to be homicide.

> "This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. *** Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case." *People v. Durio*, 794 N.Y.S.2d 863, 869 (N.Y. Sup. Ct. 2005) (holding that autopsy reports are not testimonial in nature by virtue of their status as records created in the routine course of business of the medical examiner's office).

See, *e.g.*, *People v. Caballero*, 206 Ill. 2d 65 (2002) (describing case of murder of three teenagers by four gang members: two were tried and convicted shortly after the 1979 murders, one was arrested in California in 1988 and pleaded guilty, and one was finally tried and convicted in 1992).

¶ 134    We acknowledge that defendant has cited several cases from other jurisdictions in which the courts of our sister states have held that an autopsy report is testimonial hearsay, either in a case in which the report was admitted or in which a medical examiner other than the one who performed the autopsy was permitted to testify to the contents of the report. See, *e.g.*, *State v. Davidson*, 242 S.W.3d 409, 417 (Mo. Ct. App. 2007) (holding that when an autopsy report is prepared at the request of law enforcement in anticipation of a murder prosecution and the report is offered to prove the victim's cause of death, the report is testimonial); *Martinez v. State*, 311 S.W.3d 104, 111 (Tex. Ct. App. 2010) (holding that an autopsy report is testimonial when its primary purpose is to establish or prove past events, as demonstrated by police officer's attendance at autopsy, his taking of photographs during autopsy, and where statutory basis for performance of the autopsy was suspicion of death by unlawful means); *United States v. Moore*, 651 F.3d 30, 73 (D.C. Cir. 2011) (*per curiam*) (classifying autopsy reports as testimonial when requested by law enforcement, officers are present during autopsies, and officers participated in preparation of diagrams and other portions of the reports), *cert. granted in part in Smith v. United States*, ___ U.S. ___, 132 S. Ct. 2772 (2012).

¶ 135    However, these cases are countered by cases holding that an autopsy report may be admitted into evidence without the testimony of the pathologist who performed the autopsy

without violating the defendant's rights under the confrontation clause. See, *e.g.*, *State v. Craig*, 110 Ohio St. 3d 306, 2006-Ohio-4751, 853 N.E.2d 621, at ¶¶ 80-88 (concluding that autopsy reports are admissible nontestimonial business records), *review granted by State v. Craig*, 126 Ohio St. 3d 1573, 2010-Ohio-4539, 934 N.E.2d 347 (table); *United States v. Feliz*, 467 F.3d 227, 236-37 (2d Cir. 2006) (holding that autopsy reports are admissible as business records and are nontestimonial "even where the declarant is aware that [the report] may be available for later use at trial"); *Banmah v. State*, 87 So. 3d 101, 103 (Fla. Dist. Ct. App. 2012) (autopsy reports are nontestimonial because they are prepared pursuant to statutory duty and not solely for use in prosecution); *Cato v. Prelesnik*, 2012 WL 2952183, *3 (W.D. Mich. July 18, 2012) (rejecting *Crawford* claim in *habeas* petition on basis that *Crawford* did not clearly establish that autopsy results are testimonial in nature and that even under *Melendez-Diaz*, the answer to this question is uncertain). In addition, the cases cited by defendant predate the Supreme Court's decision in *Williams*.

¶ 136    This split of opinion and the confusion regarding application of the primary purpose test to reports of forensic testing may eventually be resolved by the United States Supreme Court. In the meantime, while we are not prepared to say that the report of an autopsy conducted by the medical examiner's office can never be testimonial in nature, we conclude that under the objective test set out by the plurality in *Williams*, under the test adopted in *Davis*, and under Justice Thomas's "formality and solemnity" rule, autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial. Further, an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the assistant medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible.

¶ 137    Because the autopsy report prepared by Dr. Choi was neither "the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial" (*Williams*, 567 U.S. ___, 132 S. Ct. at 2243), nor prepared for the primary purpose of providing evidence in a criminal case (*Davis*, 547 U.S. at 822), we find that it was properly admitted because it was nontestimonial in nature.

¶ 138    Even if our prediction of the Supreme Court's resolution of this issue should prove wrong, defendant is not entitled to a new trial.

¶ 139                                                    *Reversible Error*

¶ 140    Admission of testimonial hearsay is error unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68-69. Upon showing of such an error, the defendant is entitled to a new trial unless the error was harmless beyond a reasonable doubt. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 141    Even if admission of the autopsy report was error, defendant did not properly preserve this issue and he has not argued that admission of the autopsy report was plain error. We consider his claim of error under the rubric of harmless error, aware that if an error was harmless, it most certainly cannot rise to the level of plain error.

¶ 142    Defendant argues that the error cannot have been harmless where his "mental state at the time of the offense was the key issue in dispute, and that he indicated that Latyonia's death

-24-

was an accident." He argues that Dr. Arangelovich had no personal knowledge of the condition of the victim's heart or other organs and, thus, was "entirely dependent on Dr. Choi's opinion in the matter."

¶ 143    The State argues that the autopsy report was merely cumulative evidence because Dr. Arangelovich made her own conclusions as to the cause and manner of the victim's death, based on her assessment of the postmortem photographs that were properly admitted at trial.

¶ 144    If we were to omit from the record the autopsy report itself and all testimony by Dr. Arangelovich about the report and the photographs, and if we were to ignore her testimony that she concurred with Dr. Choi's conclusions as to the cause and manner of death, we would be left with two types of evidence to consider as we determine whether any error was harmless.

¶ 145    First, the defendant does not dispute the cause and manner of death. In his statement to police, he admitted that the killing was a homicide (see Black's Law Dictionary 802 (9th ed. 2009) (defining homicide as "[t]he killing of one person by another")), and that he caused his wife's death by strangling her with his hands. During closing argument, defense counsel reiterated that he was "not contesting that the reason Latyonia Cook is dead is because Curtis choked her." Thus, the only issue in dispute was whether this homicide was intentional or knowing murder, or some less culpable form of homicide.

¶ 146    Second, Dr. Arangelovich testified as an expert in forensic pathology. The defendant stipulated to her qualifications as an expert in this field. In this role, she testified regarding death by strangulation in general. Her expert opinion that a strangling victim will lose consciousness within 10 to 30 seconds was unrebutted, as was her testimony that death would result from continued strangulation for another three to six minutes. When asked whether an individual whose heart was compromised would still require three to six minutes to die from strangulation, she answered "Correct." In her expert opinion, even if a strangling victim suffered from undiagnosed heart disease or was at increased risk of heart disease, it would still require three to six minutes of the perpetrator's squeezing her neck with his hands, with sufficient pressure to block blood flow to and from the brain, to cause death. Again, her expert opinion on this point was unrebutted.

¶ 147    Defendant's argument is that because his wife may have suffered from some undiagnosed heart or other ailment, she may have died more quickly than a healthy individual would have died from strangulation. He does not deny that he strangled her or that his acts caused her death. Instead he suggests that the court could not reasonably infer knowledge on his part because the length of time it took for her to die may have been so brief that he did not have time to consider the possible results of his actions.

¶ 148    His argument is contradicted by the expert testimony of Dr. Arangelovich. In addition, the trial court's comments upon rendering its verdict clearly indicate that the court took her expert opinion into account. However long it took between the victim's losing consciousness and her death—three minutes, four minutes, five minutes, or six minutes—defendant maintained sufficient pressure with his hands to cause her death. The court concluded that one could not maintain such pressure for such a length of time without knowing that the act could cause death or great bodily harm. See 720 ILCS 5/9-1(a)(2) (West 2002) ("A person

-25-

who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** he knows that such acts create a strong probability of death or great bodily harm to that individual.").

¶ 149    Third, this was a bench trial and the court, in explaining the basis for its verdict, relied entirely on the defendant's own statement and on the portion of Dr. Arangelovich's testimony regarding the time necessary to cause death by strangulation. The court's comments make it clear that the contents of the autopsy report had a negligible effect on its verdict.

¶ 150    Thus, we conclude that in this bench trial, the admission of the autopsy report and of any opinion Dr. Arangelovich formed based on the report—if errors at all—were harmless beyond a reasonable doubt. The defendant does not dispute the cause and manner of death or that he is guilty of some form of homicide. The expert testimony that death by strangulation would have taken three to six minutes was properly admitted and properly considered by the trial court in determining his mental state at the time he killed his wife. Even if our assessment of the admissibility of the autopsy report in this case is eventually shown to be incorrect, defendant is not entitled to a new trial.

¶ 151                          C. Sufficiency of the Evidence

¶ 152    Defendant argues that even if the autopsy report and the testimony of Dr. Arangelovich were properly admitted, the State did not prove knowing murder beyond a reasonable doubt and, at most, proved the lesser offense of involuntary manslaughter. In the alternative, he argues that if the evidence does support a verdict of knowing murder, the offense was mitigated because he killed while under the influence of a sudden, intense passion engendered by mutual combat, and he should be convicted of second degree murder.

¶ 153    For reasons already explained, we reject these arguments.

¶ 154    First, knowing murder was sufficiently proven based on defendant's own statement and the expert testimony of Dr. Arangelovich.

¶ 155    Second, the killing cannot be mitigated to second degree murder because second degree murder, by definition, is an intentional or knowing murder that is less blameworthy than first degree murder because of the presence of either one of two mitigating factors. 720 ILCS 5/9-2(a) (West 2002). Defendant cannot now claim that his guilt of knowing murder is mitigated by sudden, intense passion resulting from serious provocation when his entire defense was based on his insistence that he did not kill knowingly.

¶ 156    The appellate court noted the "incongruity" of defendant's argument that, on the one hand, denied the requisite mental state for knowing murder and, on the other hand, essentially conceded "that the State has proved intentional or knowing murder beyond a reasonable doubt in order to raise the presence of mitigating factors." 405 Ill. App. 3d at 314-15. We agree with the appellate court's thorough analysis of this issue and see no need to repeat it here. See 405 Ill. App. 3d at 314-18.

¶ 157                           CONCLUSION

¶ 158    We, therefore, affirm the judgment of the appellate court, albeit for reasons other than those offered in the appellate court opinion.

¶ 159    Appellate court judgment affirmed.

¶ 160    CHIEF JUSTICE KILBRIDE, dissenting:

¶ 161    I disagree with the majority opinion on three bases. First, the majority erroneously relies on *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality op.), a fractured opinion with no majority support for its rationale. Second, even if *Williams* represented a majority opinion, *Williams* is wholly distinguishable from this case on the facts. Finally, I disagree with the opinion employing a harmless-error analysis in the event the Supreme Court should disagree with the opinion's conclusion that the autopsy report was not testimonial.

¶ 162    The majority applies the flawed analysis from Justice Alito's opinion in *Williams*. That analysis was not joined by any other justice of the Supreme Court. As Justice Kagan (joined by Justices Scalia, Ginsburg, and Sotomayor) notes in her dissenting opinion in *Williams*, "The Court today disagrees, though it cannot settle on a reason why." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2265 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.). This is because, although the opinion was joined by three other justices, "[f]ive Justices specifically reject[ed] every aspect of its reasoning and every paragraph of its explication." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2265. Even though five justices agreed to approve the admission of the DNA profile in *Williams*, no single rationale controls that decision.

¶ 163    When there is no majority support for the rationale of an opinion, the holding of the Court can be viewed as the position taken by the members who concurred in the judgment on the narrowest grounds. See *Marks v. United States*, 430 U.S. 188, 193 (1977). Here, the majority bootstraps the positions of justices in opinions prior to *Williams* to justify its use of Justice Alito's "primary purpose" test even though that test did not garner majority support. The most that can be gleaned from the plurality opinion in *Williams* is simply that a majority held the admission of the DNA profile under the facts of that case was permissible. The majority erroneously relies on the analysis of one justice in *Williams* to support its analysis in this case.

¶ 164    Even if the analysis in *Williams* had garnered a majority vote, *Williams* is factually distinguishable, and this case should be guided by *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez-Diaz v. Massachussets*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011). In *Crawford*, the Supreme Court held that "testimonial statements of a witness who [does] not appear at trial" are not admissible "unless he [is] unavailable to testify, and the defendant *** had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54. Under *Crawford*, an out-of-court statement that is "testimonial" is admissible only when the defendant had the prior opportunity to cross-examine the person who made the testimonial statement. *Crawford*, 541 U.S. at 53-54.

¶ 165    In *Melendez-Diaz*, the Supreme Court held that *Crawford* applies to forensic reports. *Melendez-Diaz*, 557 U.S. at 310-11. The Court determined that certificates of analysis stating that a substance was cocaine had a clear "evidentiary purpose" since they were " 'made under circumstances which would lead an objective witness reasonably to believe that [they] would be available for use at a later trial.' " *Melendez-Diaz*, 557 U.S. at 310-11 (quoting *Crawford*, 541 U.S. at 52). Accordingly, the Court held that the defendant had the right to cross-examine the analysts who had authored the certificates of analysis. *Melendez-Diaz*, 557 U.S. at 310-11.

¶ 166    The Supreme Court applied the *Melendez-Diaz* analysis to a blood-alcohol forensic report in *Bullcoming*, 564 U.S. ___, 131 S. Ct. 2705. In *Bullcoming*, the State attempted to introduce a blood-alcohol report's finding through the testimony of a person who worked at the laboratory but did not perform or observe the blood test or certify its results. The Court held that "[t]he accused's right is to be confronted with" the actual analyst, unless the analyst is unavailable and the accused "had an opportunity, pretrial, to cross-examine" the analyst. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2708.

¶ 167    The autopsy report at issue in this case falls squarely within the parameters of *Crawford*, *Melendez-Diaz*, and *Bullcoming*. *Williams*, even if it were applicable to this case, is distinguishable on the facts. In *Williams*, the forensic report showed a DNA profile produced by a laboratory analyst from a vaginal swab taken from a woman after she was raped. The DNA report in *Williams* was prepared primarily to catch a rapist who was still at large. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2225.

¶ 168    Here, the autopsy report clearly and unequivocally shows that it was prepared to obtain evidence for use against defendant. The report itself shows that its results were based, in part, on the scene and police investigations. The medical examiner case report indicates the following:

> "On 24 June 2004 at approximately 1303 hrs. Detective T. Franklin #005 of the Robbins Police Department notified the Medical Examiner's Office of the following. At approximately 1053 hrs. this date, a Mrs. Sandra Cook *** contacted the Robbins Police and requested a well being check be made at her home. She related that her son in law had called her and told her 'He had done something bad to his wife Latyonia.'
>
> Officers Evans #376 and Harris #373 contacted Mr. Terrell Thomas a manager at the housing complex where the subject resided, who met them at the scene and let them into the subject[']s apartment where they discovered the subject lying in bed unresponsive[.] Robbins Fire Department responded to no avail.
>
> Detective Franklin also related that the subjects[']s husband is now in custody and admitted choking his wife.
>
> The subject along with a copy of the Police Report were ordered into the Forensic Institute."

¶ 169    Here, the autopsy report was initiated by police, in the midst of a criminal investigation. Defendant was in custody and had admitted strangling the victim. A copy of the police report was sent to the medical examiner with the victim's body. Thus, the autopsy report in this

case was prepared primarily to establish and prove facts relevant to use as evidence in a future prosecution of defendant. Under the Supreme Court's analysis in *Crawford*, *Melendez-Diaz*, and *Bullcoming*, the substance of the autopsy report could come into evidence only if defendant had the opportunity to cross-examine the responsible medical examiner. That did not happen in this case.

¶ 170     I also disagree with the majority conducting a harmless-error analysis "[e]ven if our assessment of the admissibility of the autopsy report in this case is eventually shown to be incorrect." *Supra* ¶ 150. The majority apparently believes the Supreme Court may disagree with the opinion's conclusion that the autopsy report was not testimonial. This entire harmless-error analysis is *dicta* and is purely advisory.

¶ 171     For the foregoing reasons, I respectfully dissent from the majority opinion.