# Illinois Official Reports

## Supreme Court

*People v. Barner*, 2015 IL 116949

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN BARNER, Appellant. |
| Docket No. | 116949 |
| Filed | April 16, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Lawrence P. Fox, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Pamela Rubeo, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Yvette Loizon and Amy M. Watroba, Assistant State's Attorneys, of counsel), for the People. |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion. |
| | Chief Justice Garman and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion. |
| | Justice Kilbride dissented, with opinion. |

**OPINION**

¶ 1        Defendant John Barner was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 1998)) following a jury trial in the circuit court of Cook County and sentenced to natural life in prison. His convictions and sentence were affirmed on appeal. *People v. Barner*, No. 1-06-3738 (2009) (unpublished order under Supreme Court Rule 23). Following defendant's initial appeal to this court, we vacated the appellate court's judgment and remanded the cause to that court for reconsideration in light of *People v. Williams*, 238 Ill. 2d 125 (2010). *People v. Barner*, No. 109320 (Ill. Sept. 29, 2010) (supervisory order). The appellate court again affirmed defendant's convictions and sentence. *People v. Barner*, No. 1-06-3738 (2011) (unpublished order under Supreme Court Rule 23). That decision was then vacated pursuant to a new supervisory order from this court to reconsider in light of *People v. Leach*, 2012 IL 111534. *People v. Barner*, No. 112094 (Ill. Jan. 30, 2013) (supervisory order). After reconsideration, the appellate court once again affirmed. 2013 IL App (1st) 063738-U. This court then allowed defendant's petition for leave to appeal under Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. July 1, 2013)).

¶ 2        At issue is whether defendant's right to confrontation under the sixth amendment of the United States Constitution (U.S. Const., amend. VI), as held in *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, was violated when three State witnesses were allowed to testify concerning the DNA laboratory work and conclusions of nontestifying scientists.

¶ 3        For the reasons that follow, we affirm the judgment of the appellate court.

                                    BACKGROUND

¶ 4

¶ 5        On July 14, 2002, defendant was arrested and charged by criminal complaint with the aggravated criminal sexual assault of F.M. The criminal conduct at issue occurred on the evening of March 13, 1999, and continued until the next morning.

¶ 6        Prior to defendant's trial in November 2006, the State filed motions for leave to present forensic DNA evidence against defendant through the testimony of three experts: Greg DiDomenic, Jennifer Reynolds, and Edgardo Jove. The State recognized that some of the laboratory analysis in this case was completed by nontestifying scientists working at the Illinois State Police (ISP) crime laboratory and Orchid-Cellmark (Cellmark), a private laboratory located in Maryland. Nevertheless, the State asserted that it was permissible for these three witnesses to testify to the technical review each did of the work completed by the nontestifying DNA analysts.

¶ 7        In response, defendant claimed that the analysts who completed the actual DNA laboratory work were required to testify concerning their analysis. According to defendant, any admission into evidence of the results of their work through the testimony of others would violate his constitutional right to confrontation. After a hearing, the trial court concluded that the testimony of the expert witnesses would not contravene *Crawford* and allowed the State's motions. The trial court held that the witnesses could testify to their review, analysis, and opinion regarding the work they had supervised relating to the underlying DNA work of the nontestifying scientists.

¶ 8        At trial, F.M. testified that on March 13, 1999, at approximately 8 p.m., she was walking from her sister Brenda's home on the south side of Chicago to another sister's home when she stopped to watch a young "prostitute girl" who was smoking drugs in the street and taking her clothes off. After approximately 30 to 40 minutes, F.M. heard movement behind her. Defendant grabbed her by the neck and dragged her toward a nearby abandoned building. As he pulled her into the building, F.M. grabbed a banister on the porch and defendant told her " '[l]et go [of] the porch, bitch. Bitch, I'm going to break your neck.' " Defendant subsequently dragged her through the dark building, up a flight of stairs, then up some more stairs, pushed her into a room, and placed a couch in front of the door.

¶ 9        F.M. further testified that after they entered the room, defendant ordered her to remove her clothes and to sit on a mattress on the floor. At first she refused, but ultimately obeyed. F.M. testified that defendant repeatedly forced her to engage in oral and vaginal intercourse until morning. She testified that they had vaginal intercourse about four times and that she was forced to perform oral sex on him twice. She further testified that he forced her to have vaginal intercourse one more time in the morning. Defendant then led her out of the building and let her go. As he was helping her out of a window, she saw defendant's face from a couple of inches away. After leaving defendant, F.M. ran to her sister's house and was taken to Provident Hospital for treatment. At the hospital, a doctor swabbed her mouth and vagina and police took her underwear, bra, T-shirt, and long underwear.

¶ 10       On May 30, 2002, more than three years after the assault, the police showed F.M. a photo array at her house and she made a tentative identification of defendant. On July 13, 2002, she viewed a lineup at the police station and identified defendant as her attacker after each lineup participant stated the phrase, "Bitch, if you don't let go, I'll break your neck." She also positively identified defendant in court. F.M. testified that she had been convicted in May 2006 for possession of a controlled substance and received a sentence of probation.[1]

¶ 11       On cross-examination, F.M. testified that defendant did not let her go to the bathroom, that she urinated on the floor, and that she had lost her keys during the attack. Defense counsel also questioned her concerning some inconsistencies on the exact number of times each sex act was performed.

¶ 12       F.M.'s sister, Brenda J., testified that around 8 a.m. on March 14, 1999, F.M. arrived at her house "hysterical." Brenda testified that her sister was crying, screaming, dirty, and beaten up. F.M. told Brenda that she had been raped.

¶ 13       Sharon Smith, a registered nurse at Provident Hospital, testified that she treated F.M. at approximately 8:45 a.m. on March 14, 1999. F.M. appeared scared and looked disheveled. Smith testified that Dr. Bhatt took swabs of F.M.'s vagina and mouth and that she sealed those swabs in a sexual assault evidence collection kit. She gave the kit to a police officer along with, among other items, F.M.'s underwear. Smith further testified that she observed blood in F.M.'s vaginal canal and that she had an abrasion on her right thigh. Smith did not observe any scratches, bruises, or other marks on F.M.'s body other than the one on the thigh.

---

[1]At the time of defendant's trial, F.M. was being held in custody for a violation of probation and on a warrant for failure to appear in court in this case. F.M. testified that she had failed to appear because she did not want to see defendant again.

¶ 14    Chicago police officer Gerald Ostafin testified that he received the sexual assault kit from Smith on March 14, 1999. He kept the items in his continuous custody and control and inventoried the kit under inventory No. 2105348.

¶ 15    Chicago police detective Paulette Wright testified that she interviewed F.M. at the hospital at approximately 10:45 a.m. on March 14, 1999. F.M. was very upset and agitated. The following morning, she took F.M. to the abandoned building where the incident occurred to investigate and locate the set of keys she had lost. Wright observed a green couch in the third floor room and testified that F.M. became visibly upset when they entered the space. Wright did not see urine on the floor or locate any keys. On August 23, 1999, the ISP crime lab informed Wright that the semen recovered from the item in F.M.'s sexual assault kit produced a match. Wright tried to contact F.M. by going to her home and that of her sister, but was unsuccessful for almost three years.

¶ 16    Wright further testified that on May 29, 2002, she again went to F.M.'s home. Wright showed her a photo array at that time and F.M. made a tentative identification of defendant as her attacker. She informed Wright, however, that she needed to see him in person. Wright sent out an "investigative alert" for defendant who was ultimately taken into custody on July 12, 2002. The following day, F.M. viewed a physical lineup. She tentatively identified defendant and mentioned that he looked thinner to her. F.M. then asked to hear each lineup participant speak. After hearing defendant's voice, F.M. said that defendant was "definitely" her attacker.

¶ 17    The State called G.W. as an "other crimes" witness. At the time of trial, G.W. had been convicted for possession of a controlled substance and forgery and was in custody. On the evening of March 23, 2002, G.W. was walking within blocks of the abandoned building where the assault in this case had occurred. G.W. testified that defendant approached her and attempted to engage her in small talk. He then grabbed her by the hood of her coat and said, "Shut up bitch before I kill you." He then dragged her into an abandoned building and ordered her down the rear stairs. When she refused, he struck her over the head with a bottle of beer. He pushed her down the stairs and ordered her to take her clothes off. Defendant had vaginal sex with G.W. and forced her to perform oral sex on him repeatedly before he let her leave in the morning.

¶ 18                                    Forensic Evidence

¶ 19    All of the DNA work at issue in this case was conducted between 1999 and 2001.

¶ 20    Brian Hapack, a forensic scientist with ISP, testified that he received F.M.'s sexual assault kit that was submitted to ISP's crime lab on March 23, 1999, and inventoried under inventory No. 2105348. He tested the items in the kit for the presence of sperm using the acid phosphatase test and slide examination. He determined that there was semen on F.M.'s underwear, as well as the rectal and vaginal swabs, but not the oral swabs. Hapack sealed and placed the items into a secured freezer for future DNA analysis.

¶ 21    Chicago police detective Delores Myles testified that on April 26, 1999, she took defendant to Provident Hospital where she observed a nurse take a blood specimen from him. She sealed the specimen in a blood specimen kit and inventoried it under No. 2111323.

¶ 22    The record establishes that defendant's blood standard was collected by police in relation to the unrelated murder case of Cheryl Cross.

Greg DiDomenic, a forensic DNA analyst at the ISP crime lab, testified that he received the sexual assault kit containing the vaginal and rectal swabs taken from F.M., her underwear which was stained by semen, and a sample of her blood. In July 1999, he isolated F.M.'s DNA profile from the vaginal swab, but was unable to produce a profile for the donor of the sperm found on the vaginal or rectal swabs because each sample was of insufficient quantity to do so. A DNA profile of the sperm donor, however, was obtained from the semen stain on F.M.'s underwear. DiDomenic compared "five locations of DNA" using the "restriction fragment length polymorphism" (RFLP) analysis method. He explained that at the time he conducted his analysis, it was established in the scientific community "that there were five genetic markers used in forensics and those were the ones we used [for our testing]." DiDomenic further testified that he entered the DNA profile he created into the Combined DNA Index System (CODIS), ISP's DNA database, and discovered that it was associated with a standard from defendant.

DiDomenic testified, over defense counsel's objection, that subsequent to the CODIS "hit" he reasonably relied on the work of two other analysts, Tanis Wildhaber and Joanne Olson. DiDomenic reviewed the laboratory notes produced by Wildhaber, which indicated that on April 28, 1999, she received defendant's blood sample which had been inventoried under No. 2111323. She preserved a portion of that sample, dried it down on filter paper, sealed it, and placed it in frozen storage for future analysis. DiDomenic also reviewed the laboratory notes produced by Olson, which indicated that she retrieved defendant's sample on May 1, 1999, and was able to obtain a DNA profile from his blood that was suitable for comparison. Olson placed the remainder of defendant's blood standard in frozen storage. Based upon DiDomenic's analysis of the sperm from the semen stain on F.M.'s underwear, and the work of Olson that produced defendant's DNA profile, he opined within a reasonable degree of scientific certainty that the semen identified on the underwear was consistent with having originated from defendant.

On cross-examination, DiDomenic explained that although he relied on the work of Wildhaber and Olson, he did not observe either execute their work and did not attempt to replicate their work by conducting the analysis again himself. Instead, he relied on the written notes that they made while working at the laboratory and explained that based on his examination of their notes, his personal experiences working with them, and the fact that he received the same training and followed the same protocols, he agreed with their conclusions and believed that they followed all of the proper procedures in doing their work. He further testified that DNA analysis enables forensic scientists not only to match, but also to exclude individuals. He explained that forensic scientists look at evidence in a reference sample and can tell whether a person could, or could not have, contributed to a particular stain.

*STR DNA Testing*

Dr. Jennifer Reynolds, a forensic DNA expert, testified that she was formerly employed by Cellmark as its laboratory director. At Cellmark, she supervised DNA analysis in criminal cases, reviewed data, and drew independent conclusions from the data. According to Dr. Reynolds, Cellmark assisted the ISP crime lab with a backlog of DNA casework and that it was standard practice in 2001 for ISP to send such samples to Cellmark. Dr. Reynolds testified,

over defense counsel's objection, that a Cellmark case file indicated that on May 1, 2001, it received from ISP a standard of blood identified as being from defendant. She testified that as a result of the forensic analysis subsequently completed at Cellmark's laboratory, a DNA profile of defendant was produced and sent to ISP. Dr. Reynolds further testified that she completed a "technical review" of the case file and reasonably relied on information contained therein. She testified that the analysis performed on defendant's blood by an unnamed Cellmark employee was of a type commonly accepted within the scientific community and followed proper protocols. When asked to explain this conclusion, she stated that she based her opinion on the case file and the control samples that were run with this case. Dr. Reynolds testified that she saw no evidence of contamination with defendant's blood standard. She acknowledged that she did not complete any laboratory analysis of defendant's blood herself, but merely reviewed notes produced by the other analyst who completed the work.

¶ 29    Edgardo Jove, an expert in the field of forensic DNA analysis, testified that he is a group supervisor in the forensic biology DNA section at the ISP crime lab. He testified, over defense counsel's objection, that he performed a technical review of analysis conducted by ISP forensic chemist Sandra Lambatos.[2] He explained that Lambatos performed a newer and more accurate form of DNA analysis than completed by DiDomenic in 1999. Jove further explained that this newer method, called the "short tandem repeat" (STR) method, compared 13 areas of DNA, instead of the five areas of DNA analyzed under the method utilized by DiDomenic. Jove testified that Lambatos conducted DNA analysis on the semen stain from F.M.'s underwear and that she obtained a male DNA profile. Lambatos then compared that DNA profile to defendant's known standard and concluded that the two matched. Defendant's known standard was based on the updated profile completed by an analyst at Cellmark. Jove explained that the ISP crime lab had a standard practice of sending its DNA samples to Cellmark for analysis in order to decrease the backlog of cases requiring forensic analysis.

¶ 30    Jove further testified that he performed a "technical review" of the work done by Lambatos and the Cellmark analyst and concluded that the male DNA profile found in the semen stain on F.M.'s underwear matched that of defendant. Jove opined that the DNA profile extracted from the semen stain on the underwear would be expected to occur in approximately "one in 1.4 quadrillion black, one in 130 quadrillion white or one in 70 quadrillion Hispanic unrelated individuals." Jove acknowledged that he did not personally perform any laboratory work on the forensic evidence gathered in this case and that he did not try to duplicate the analysis completed by either the Cellmark scientists or Lambatos. Jove testified that, based on his review of Lambatos's laboratory notes, he was able to conclude that she followed the scientific protocol established by the ISP, which is generally accepted in the forensic science community.

¶ 31    Defendant presented no evidence at trial.

¶ 32    In closing argument, the defense argued, *inter alia*, that F.M. voluntarily met defendant and they had a "rendezvous." Defense counsel stated:

---

[2]Lambatos wrote a report of her DNA analysis in this case, dated August 22, 2001, that was not admitted at trial.

"She [F.M.] has an intent to lie in this case. She goes off with John Barner. They stay the night together. At the [end] of the night, he doesn't give her anything, no money, nothing. He leaves.

   ***

And if the State really wanted to make a big deal about DNA, they should have brought in the people that actually did the test. *** [B]ring in the person that did the notes, *** bring them in to show what they did, what tests they performed, not somebody else who looked over their notes."

¶ 33      The jury found defendant guilty of two counts of aggravated criminal sexual assault. He was subsequently sentenced to natural life imprisonment.

¶ 34      On appeal, defendant argued, *inter alia*, that his right to confrontation under *Crawford* was violated when the State's forensic witnesses, some of whom did not conduct laboratory analysis themselves, testified regarding the conclusions of nontestifying forensic analysts. 2013 IL App (1st) 063738-U, ¶ 39. In affirming defendant's convictions following our remand to reconsider in light of *Leach*, the appellate court concluded that although DiDomenic, Jove, and Reynolds relied upon the work of other experts in reaching their conclusions, the results of the work of the nontestifying experts were not testimonial as they are indistinguishable from those at issue in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality opinion). 2013 IL App (1st) 063738-U, ¶ 68. The appellate court held that although some of the nontestifying experts were employed by a law enforcement agency, nothing in the record suggests that they could have known whether the profiles, which were not in and of themselves incriminating, would ultimately confirm the identification of defendant as F.M.'s attacker, or exonerate him. *Id.* ¶ 71. The appellate court concluded that the DNA profiles in this case were not created for the primary purpose of incriminating defendant, but for investigating the identity of F.M.'s attacker. *Id.* ¶¶ 70-71. The appellate court also held that the reports upon which the witnesses relied lacked the requisite "formality and solemnity" to constitute a testimonial statement. *Id.* ¶ 71; *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment).

¶ 35      Justice Robert Gordon dissented. He believed that defendant's DNA profile, which was created by two nontestifying DNA experts from defendant's blood sample, was prepared for the primary purposes of accusing a targeted individual and for providing evidence in a criminal case against him. 2013 IL App (1st) 063738-U, ¶ 95 (Gordon, P.J., dissenting). He therefore concluded "that the report at issue was testimonial and cannot be admitted as an exception to the rule against hearsay." *Id.* In reaching this conclusion, he emphasized that the nontestifying witnesses were employees of the ISP crime lab. *Id.* ¶ 96.

¶ 36      Defendant subsequently filed a petition for leave to appeal in this court under Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. July 1, 2013)), which we allowed.[3]

---

[3]After allowing defendant's petition for leave to appeal, we entered an order directing the circuit court to bind and certify certain documents for filing with this court as a supplemental record. This material includes ISP and Cellmark lab reports, documents and case files. We also granted the parties time for additional briefing to address the significance, if any, of these documents to their arguments.

¶ 38     As before the appellate court, defendant contends that his right to confrontation under *Crawford* and its progeny was violated when DiDomenic, Dr. Reynolds, and Jove testified concerning the DNA laboratory work and conclusions of nontestifying scientists at ISP and Cellmark.

¶ 39     We apply *de novo* review of this issue because defendant's claim that his sixth amendment right of confrontation was violated constitutes a question of law. *Leach*, 2012 IL 111534, ¶ 64.

¶ 40     The sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This portion of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007).

¶ 41     Current confrontation clause jurisprudence stems from *Crawford*. There, the Supreme Court held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford*, 541 U.S. at 68-69. Specifically, "the Sixth amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,' " to which its rule applied. *Id.* However, the Court recognized "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.*

¶ 42     Thereafter, in *Davis v. Washington*, 547 U.S. 813 (2006), the Court explained the distinction between testimonial and nontestimonial statements:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

The *Davis* Court cautioned in a footnote, however, that it did not mean to "imply *** that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 822 n.1.

¶ 43     Justice Thomas, in his partial concurrence, concluded that out-of-court statements that lack "some degree of solemnity" are not testimonial in nature. *Id.* at 836 (Thomas, J., concurring in part and dissenting in part). He would have found affidavits, depositions, prior testimony, and confessions sufficiently solemn "to constitute formalized statements" subject to the rule of *Crawford*. *Id.* at 836-37.

¶ 44     The Supreme Court has, on three subsequent occasions, considered whether scientific reports are testimonial under *Crawford* and subject to the strictures of the confrontation clause.

¶ 45     First, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Court considered whether sworn certificates from forensic analysts, admitted to attest that the substance seized from the defendant was cocaine, were testimonial for confrontation clause purposes. Five members of the Court held in the affirmative. Four members reasoned that "the *sole purpose* of

the affidavits[,] was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance," and that it could be safely assumed "that the analysts were aware of the affidavits' evidentiary purpose." (Emphasis in original.) *Id.* at 311 (quoting Mass. Gen. Laws ch. 111, § 13). They concluded that although the analysts' statements might "qualify as business or official records," they were prepared specifically for use in a criminal trial and were, therefore, testimony against the defendant and subject to confrontation. *Id.* at 324.

¶ 46 Justice Thomas, providing the necessary fifth vote to find a violation of the confrontation clause, distanced himself from consideration of the primary purpose of the out-of-court statement. He reiterated his adherence to the position that extrajudicial statements implicate the confrontation clause "only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." (Internal quotation marks omitted.) *Id.* at 329 (Thomas, J., concurring).

¶ 47 Next, in *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), the Court considered whether a lab report, certifying the results of a blood-alcohol test performed on a sample taken from the defendant at the time of his arrest for driving while intoxicated, was properly introduced at trial. *Id.* at ___, 131 S. Ct. at 2709-10. The signatory analyst did not testify, but another analyst familiar with the laboratory's procedures did. *Id.* at ___, 131 S. Ct. at 2709-10. The testifying analyst, however, had not participated in or observed the defendant's blood test. *Id.* at ___, 131 S. Ct. at 2709.

¶ 48 In vacating the defendant's conviction, the *Bullcoming* Court stressed that the blood-alcohol test results were testimonial in nature because the report was created solely for an " 'evidentiary purpose' " in aid of a police investigation. *Id.* at ___, 131 S. Ct. at 2717 (quoting *Melendez-Diaz*, 557 U.S. at 311). Although the report lacked formal certification or notarization, the formalities attending the creation of the report and its purpose were "more than adequate" to classify it as testimonial. *Id.* at ___, 131 S. Ct. at 2717.

¶ 49 Most recently, in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012), the Court considered, similar to this case, whether a DNA expert's testimony violated the confrontation clause. The expert witness, employed by the ISP crime lab, testified at a bench trial regarding a DNA match that incriminated the defendant. *Id.* at ___, 132 S. Ct. at 2229. The ISP had sent Cellmark, the same private laboratory utilized in this case, a vaginal swab and directed Cellmark to conduct DNA analysis. *Id.* at ___, 132 S. Ct. at 2230. Cellmark returned the vaginal swab and a report containing the DNA analysis. *Id.* at ___, 132 S. Ct. at 2230. The expert witness testified that the DNA profile obtained by Cellmark from the vaginal swab matched the defendant's DNA profile, which was obtained from the State's forensic database. *Id.* at ___, 132 S. Ct. at 2230. The expert witness did not have any firsthand knowledge of how Cellmark handled the vaginal swab, what tests were actually run on the swab or the manner in which the tests were conducted. *Id.* at ___, 132 S. Ct. at 2230. The expert witness was permitted, however, to testify that the DNA taken from the vaginal swab matched to a reasonable degree of medical certainty the defendant's DNA. *Id.* at ___, 132 S. Ct. at 2230. In *Williams*, as in the instant case, the report itself was not admitted into evidence. *Id.* at ___, 132 S. Ct. at 2230.

¶ 50 Five members of the Court held that the expert testimony at issue did not violate the confrontation clause. Four of the five reasoned that:

"[T]his form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* at ___, 132 S. Ct. at 2228.

¶ 51 The four also provided a "second independent basis" for their decision:

"[W]e also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." *Id.* at ___, 132 S. Ct. at 2228.

¶ 52 Justice Thomas, again providing the necessary fifth vote, concluded that there was no violation of the confrontation clause because the statements at issue, while being admitted for the truth of the matter asserted, lacked the formality and solemnity associated with testimonial evidence. *Id.* at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment). The four dissenting justices found that the statements were offered for the truth of the matter asserted and did violate the confrontation clause. *Id.* at ___, 132 S. Ct. at 2264-65 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.).

¶ 53 Following *Williams*, this court had an opportunity to consider whether the admission of expert testimony recounting autopsy findings of another pathologist, and admission of the autopsy report itself, violated the confrontation clause. In *Leach*, we analyzed whether an autopsy report constituted testimonial hearsay. We conducted a comprehensive review of the Supreme Court's instructions from *Crawford* through *Williams*. We ultimately summarized the positions of the plurality and dissent in *Williams* as follows:

"When we must determine whether a forensic report is testimonial in nature, the *Williams* plurality instructs us to apply an objective test, looking for 'the primary purpose that a reasonable person would have ascribed to the statement, taking into

account all of the surrounding circumstances.' *Id.* at \_\_\_, 132 S. Ct. at 2243. If this inquiry reveals that the forensic report was 'made for the purpose of proving the guilt of a particular criminal defendant at trial' (*id*. at \_\_\_, 132 S. Ct. at 2243), it is testimonial.

The *Williams* dissent rejects this focus on the targeting of a particular individual, reminding us that *Davis* formulated the test as whether the out-of-court statement was 'made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence.' *Id.* at \_\_\_, 132 S. Ct. at 2273 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.) (quoting *Davis*, 547 U.S. at 822)." *Leach*, 2012 IL 111534, ¶¶ 120-21.

¶ 54    In *Leach*, we found that whichever definition of primary purpose is applied, the autopsy report was not testimonial because it was not prepared for the primary purpose of accusing a targeted individual or for the primary purpose of providing evidence in a criminal case. *Id.* ¶ 122. We also found that under Justice Thomas's "formality and solemnity" rule, autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial. *Id.* ¶ 136.

¶ 55                                    RFLP DNA Evidence

¶ 56    Turning to defendant's specific claims, he first challenges Wildhaber's 1999 report concerning the preservation of his blood standard, as well as Olson's 1999 report detailing her RFLP DNA analysis of his blood standard, as testimonial statements that should not have been admitted into evidence through the testimony of DiDomenic.

¶ 57    As a threshold matter, the State argues that defendant has forfeited any review of his contentions surrounding Wildhaber's and Olson's work because that argument was not specifically contained in his petition for leave to appeal. The State is correct that the thrust of defendant's argument in his petition related to testimony concerning the analysis completed by Lambatos. We will address his argument here, however, because it is closely related to the claim contained in his petition that his right to confrontation was violated when a State's witness was allowed to testify concerning the lab work and conclusions of nontestifying scientists. See *People v. McKown*, 236 Ill. 2d 278, 310 (2010) ("When an issue is not specifically mentioned in a party's petition for leave to appeal, but it is inextricably intertwined with other matters properly before the court, review is appropriate." (Internal quotation marks omitted.)). We also note that the issue was properly preserved below because defendant repeatedly argued both in the trial and appellate courts that testimony by DiDomenic concerning Wildhaber's and Olson's work on the preservation and testing of his blood standard violated his right to confrontation.

¶ 58    Now, against the backdrop of *Crawford* and the subsequent authorities applying it, we consider the confrontation clause implications, if any, of DiDomenic's testimony regarding the work performed by Olson and Wildhaber.

¶ 59    At trial, DiDomenic testified that the semen identified from the stain on F.M.'s underwear was consistent with having originated from defendant. In reaching this conclusion, DiDomenic explained that he developed an RFLP DNA profile from the semen stains on the underwear, that he entered the profile into the CODIS system, and that there was a "hit." He subsequently reviewed the laboratory notes and casework of Wildhaber and Olson that had produced defendant's RFLP DNA profile and concluded that they matched. He did not testify to the

details of the data at the RFLP markers and provided no opinion as to the rarity of the RFLP DNA profile.

¶ 60 As we recognized in *Leach*, when determining whether a forensic report is testimonial in nature, the *Williams* plurality instructs us to apply an objective test, looking for "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Leach*, 2012 IL 111534, ¶ 120. If this inquiry reveals that the forensic report was "made for the purpose of proving the guilt of a particular criminal defendant at trial, it is testimonial." *Id.*

¶ 61 Based on the documents contained in the supplemental record, defendant now acknowledges that Olson's and Wildhaber's work on his blood standard in 1999 was not performed after the CODIS "hit" in this case but, rather, for the purpose of uploading it into CODIS in order to compare it to evidence from the *unrelated* Cheryl Cross murder investigation. Defendant was not in custody on that matter when he submitted his blood sample and was ultimately eliminated as a suspect in the Cross murder case.

¶ 62 We are not persuaded by defendant's argument that the targeted individual test still applies to Olson's and Wildhaber's out-of-court statements because the work of these two scientists employed by a law enforcement agency was performed at a time when he was a suspect in a criminal case, even if that case was not the instant case. As with the report at issue in *Williams*, the reports by Olson and Wildhaber were produced before any suspect was identified in this case. The reports were not sought for the purpose of obtaining evidence to be used against defendant, who was not even under suspicion in this case at the time they were produced, but for the purpose of resolving the unrelated murder case. As in *Williams*, the two nontestifying scientists could not have possibly known that the DNA profile produced at the ISP crime lab would turn out to later inculpate defendant in the unrelated sexual assault of F.M. Similar to *Williams*, the possibility that shoddy lab work or malfeasance by the DNA analysts doing work in the Cross investigation would somehow produce a match to a person later picked out of a police lineup by the victim in this case is "beyond fanciful." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2244.

¶ 63 We have also reviewed the laboratory case files and reports contained in the record, including DiDomenic's. These documents consist of lab case notes and worksheets, data from DNA testing, inventory forms, consent for analysis on samples, and conversation logs. These files and reports are markedly different from the signed laboratory report certifying the results of the blood-alcohol test performed on the sample taken from the defendant in *Bullcoming*, or the sworn certificates from the forensic analysts in *Melendez-Diaz*, which were admitted into evidence to attest to the substance that was seized from the defendant. None of the documents in this case take the form of an affidavit, attestation, certification, sworn statement, or formal declaration. Similarly, defendant has not cited to any document in the record created by either Wildhaber or Olson that takes such form. Consequently, we find the documents here lack the "formality and solemnity" that Justice Thomas has consistently found necessary for a statement to be testimonial.

¶ 64 For these reasons, we conclude that based upon the Court's most recent instructions in *Williams*, and our holding in *Leach*, the reports by Olson and Wildhaber were nontestimonial, and their admission through the testimony of DiDomenic did not violate defendant's right to confrontation.

¶ 65        Defendant also raises, for the first time in this court, a claim that DiDomenic's testimony about the "entry of his [original] DNA profile into CODIS" in 1999 by an unknown individual was testimonial hearsay and should not have been allowed. The same is true with his claim that DiDomenic's testimony concerning the analysis performed by Wildhaber and Olson was impermissible because it was offered for the truth of the matter asserted. Defendant fails to pinpoint the specific testimony that he is challenging. As the State asserts, defendant did not raise these issues in the trial court, the appellate court, or in his petition for leave to appeal with this court. Additionally, defendant's arguments on these issues are entirely undeveloped and unclear. For all these reasons, we find these claims forfeited and decline to address them. See *People v. Robinson*, 223 Ill. 2d 165, 173-74 (2006) (defendant forfeited this court's consideration of an issue where it was not raised in his posttrial motion, his appeal before the appellate court, or in his petition for leave to appeal to this court); see also *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 ("a reviewing court is not simply a depository into which a party may dump the burden of argument and research").

¶ 66                                     STR DNA Testimony

¶ 67        Defendant also claims that his right to confrontation was violated through Jove's testimony concerning Lambatos's report from August 2001, regarding her updated STR DNA testing of F.M.'s underwear and her comparison of that DNA profile to defendant's STR DNA profile. Similarly, he challenges Dr. Reynolds's testimony regarding the forensic analysis completed by an unnamed scientist at Cellmark which resulted in the creation of defendant's updated DNA profile which was produced and sent to ISP. Defendant unconvincingly claims that documents contained in the record show that ISP and the Chicago police department communicated throughout the investigation of F.M.'s sexual assault, including after the CODIS hit, which supports his claim that the new testing performed by Lambatos and Cellmark was done for the primary purpose of accusing a targeted individual (*i.e.*, defendant) or creating evidence for use in a criminal case.

¶ 68        The State responds that in 2000-01 DNA databases and laboratories were involved in a statewide conversion from RFLP DNA analysis to STR technology. According to the State, the work completed on defendant's blood standard at Cellmark, and Lambatos's testing of the DNA found on the underwear, was done as part of this process. According to the State, this conversion made it possible for STR profiles to be entered into CODIS, which was transitioning to using the 13 core STR loci and phasing out of the RFLP markers. Consequently, the State claims that the purpose of the updated testing in this case had nothing to do with accusing a targeted individual, namely defendant, but was part of this transition to the use of STR profiles. The State also points out that all of the DNA testing in this case was completed approximately one year prior to when defendant was arrested and charged with the sexual assault of F.M.

¶ 69        We recognize that defendant's trial occurred in 2006, well before case law on the right to confrontation developed to include inquiries of whether certain evidence was prepared for the primary purpose of targeting a specific individual or for use in a criminal prosecution. We can find nothing in the record, however, that conclusively establishes that the reason Lambatos, and the Cellmark analysts, performed their work on the samples was due to a statewide

- 13 -

conversion process.[4] The record similarly fails to establish that it was done for the primary purpose of targeting defendant or creating evidence for use in a criminal prosecution as defendant urges.

¶ 70    Nevertheless, we do not have to surmise as to the State's purpose for updating the profiles using STR DNA technology. We conclude that even if the testimony of Jove and Dr. Reynolds regarding the lab work and conclusions of the two nontestifying scientists violated defendant's right of confrontation, he would not be entitled to a new trial because the error would be harmless beyond a reasonable doubt.

¶ 71    Admission of testimonial hearsay is error unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination. *Leach*, 2012 IL 111534, ¶ 140 (citing *Crawford*, 541 U.S. at 68-69). Upon showing of such an error, the defendant is entitled to a new trial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained at trial. *Id.* "When determining whether an error is harmless, a reviewing court may, (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." (Internal quotation marks omitted.) *In re Brandon P.*, 2014 IL 116653, ¶ 50.

¶ 72    In this case, F.M. testified that on the evening of March 13, 1999, defendant dragged her from the street into an abandoned building, ordered her to remove her clothes, and repeatedly forced her to engage in oral and vaginal intercourse for hours. Prior to being released by defendant the following morning, F.M. testified that she was able to see his face from a couple of inches away. F.M. positively identified defendant as her attacker over a period of years first in a photo array, then a physical lineup, and finally at trial. Although F.M.'s testimony was slightly inconsistent on minor details concerning the exact number of times each sex act was performed, and she was reluctant to testify at trial, she was consistent in her claim that defendant assaulted her.

¶ 73    After leaving the abandoned building, F.M. immediately went to her sister Brenda's house. Brenda testified that when F.M. arrived at her home she was hysterical, crying, dirty, looked beat up, and said that she had been raped. Smith testified that she treated F.M. at Provident Hospital at 8:45 a.m. on March 14, 1999. F.M. appeared scared and looked disheveled. While Smith did not observe any scratches, bruises, or other marks on F.M.'s body, she did observe blood in her vaginal canal and an abrasion on her right thigh. Detective Wright testified that she interviewed F.M. at the hospital and F.M. was very upset and agitated. The following morning, she took F.M. to the abandoned building. Detective Wright observed a couch in the third-floor room, consistent with F.M.'s testimony, and stated that F.M. became visibly upset when they entered the space.

---

[4]The State claims that the trial record "clearly establishes" that the STR testing of defendant's blood standard at Cellmark was done as part of this statewide process to convert RFLP DNA samples to STR profiles. In doing so, the State repeatedly cites to a page in the record that includes the background section of one of its own motions *in limine*. We obviously cannot rely upon a factual representation made in the background section of a party's own motion which cannot be independently established in the record.

¶ 74    Additionally, we have already determined that RFLP DNA evidence linking defendant to the victim was properly admitted at trial. DiDomenic testified that he was able to create a DNA profile of the sperm donor from the semen stain on F.M.'s underwear. DiDomenic compared five locations of DNA using the earlier RFLP DNA analysis method. At the time that he conducted this analysis in 1999, he explained that it was the established method in the scientific community. DiDomenic testified that he entered the RFLP DNA profile that he created from F.M.'s underwear into CODIS and there was a "hit." Based upon DiDomenic's own forensic analysis of the sperm from the semen stain on F.M.'s underwear, and his comparison of defendant's known DNA profile, he opined that the semen identified on the underwear was consistent with having originated from defendant.

¶ 75    We also emphasize that the main focus at trial, as illustrated by defense counsel's closing argument, did not have to do with the identification of F.M.'s attacker. Instead, the primary issue for the jury to consider was F.M.'s credibility and whether the jury believed her account of the assault. Based upon the verdict in this case, the jury found F.M.'s testimony credible and did not believe the sexual activity was consensual.

¶ 76    Moreover, G.W. testified that defendant attacked her in a very similar fashion, by grabbing her on the street and forcing her into an abandoned building in the same general area as F.M. was attacked. G.W. also testified that defendant repeatedly forced her to engage in vaginal intercourse and to perform oral sex on him over a period of hours until he finally released her the next morning.

¶ 77    Defendant presented no evidence at trial and did not impeach the State's witnesses in any significant way.

¶ 78    For these reasons, we find that even if the testimony of Jove and Dr. Reynolds concerning the reports of the nontestifying witnesses violated defendant's right of confrontation, it was harmless beyond a reasonable doubt. This evidence would be cumulative or duplicative of the properly admitted DNA evidence, any improperly admitted evidence did not contribute to defendant's guilt, and the properly admitted evidence in this case overwhelmingly supports defendant's conviction.

¶ 79                                    CONCLUSION

¶ 80    Accordingly, we affirm the judgment of the appellate court affirming the circuit court.

¶ 81    Affirmed.

¶ 82    JUSTICE KILBRIDE, dissenting:

¶ 83    I dissent from the majority opinion. I joined the majority in *People v. Williams*, 238 Ill. 2d 125 (2010), where this court held that an expert's testimony, relying on a DNA report prepared by a laboratory, did not implicate a defendant's sixth amendment confrontation right. That decision was affirmed by the Supreme Court on other grounds. *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality opinion). In this case, as in *People v. Leach*, 2012 IL 111534, I believe the majority erroneously relies on *Williams*, 567 U.S. ___, 132 S. Ct. 2221, "a fractured opinion with no majority support for its rationale." *Leach*, 2012 IL 111534, ¶ 161 (Kilbride, C.J., dissenting). I believe the majority in this case also erroneously relies on the isolated position of Justice Thomas in *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas,

J., concurring in the judgment), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009) (Thomas, J., concurring), and *Davis v. Washington*, 547 U.S. 813, 836 (2006) (Thomas, J., concurring in the judgment in part and dissenting in part), to bolster its decision in this case when that position has never been joined by any other Supreme Court justice. I believe *Williams* provides no guidance for resolving this case.

¶ 84     In *Leach*, I noted that "[t]he most that can be gleaned from the plurality opinion in *Williams* is simply that a majority held that admission of the DNA profile under the facts of that case was permissible." *Leach*, 2012 IL 111534, ¶ 163 (Kilbride, C.J., dissenting). Since the Supreme Court issued the fractured holdings in *Williams*, many other courts have recognized *Williams* as a case of questionable precedential value. See *United States v. Katso*, 73 M.J. 630, 638 (A.F. Ct. Crim. App. 2014) (finding "*Williams* does not provide a definitive test for determining when a statement is to be deemed testimonial" and, accordingly, applying pre-*Williams* confrontation clause law); *State v. Dotson*, 450 S.W.3d 1 (Tenn. 2014) (finding *Williams* provides little guidance and is of uncertain precedential value); *State v. Michaels*, 95 A.3d 648, 666 (N.J. 2014) (finding "*Williams*'s force, as precedent, at best unclear" and, accordingly, applying pre-*Williams* confrontation clause law); *Jenkins v. United States*, 75 A.3d 174, 184 (D.C. 2013) (noting that *Williams* "has not provided any clarity" to confrontation clause jurisprudence); *United States v. Tearman*, 72 M.J. 54, 58 (C.A.A.F. 2013) (recognizing that current state of the law for determining when a particular statement is classified as testimonial is unclear and "far from fixed"); *State v. Ortiz-Zape*, 743 S.E.2d 156, 161 (N.C. 2013) (noting "lack of definitive guidance" provided by *Williams*); *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013) (finding *Williams* does not provide a controlling rule); *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013) (finding plurality's test in *Williams* not "controlling"); *State v. Kennedy*, 735 S.E.2d 905, 916 (W. Va. 2012) (viewing *Williams*, a fractured plurality opinion, "with caution" as "*Williams* cannot be fairly read to supplant the 'primary purpose' test previously endorsed by the Court").

¶ 85     Additionally, when discussing the RFLP DNA evidence, the majority opinion erroneously states that "Defendant was not in custody on [the unrelated Cheryl Cross murder investigation] when he submitted his blood sample and was ultimately eliminated as a suspect in the Cross murder case." *Supra* ¶ 61. On the contrary, defendant was, in fact, under arrest, in police custody, and under suspicion for a crime when the blood sample was drawn and sent to the lab for testing. Therefore, Olson's and Wildhaber's work was prepared to obtain evidence for use against defendant in a criminal case (albeit a different criminal case). No case examined by the majority has determined that the DNA report must be prepared for evidence in the specific case targeting the defendant. No doubt the DNA report would have been "testimonial" had it been used as evidence against this defendant in the murder case. I fail to see, however, how the DNA report now becomes nontestimonial when it is introduced in a criminal prosecution of the same defendant in a different case. This, logically, cannot be.

¶ 86     I disagree with the majority that any error in the admission of the STR DNA testimony was harmless, particularly when the majority's harmless-error analysis relies heavily on the RFLP DNA evidence that I believe violates *Crawford*. Additionally, the victim initially named "Carl Long" as the assailant, but the DNA analysis on his buccal swab standard was canceled after the CODIS matched to defendant. The ISP crime lab notes indicate the investigating detective "says victim named Carl Long as an assailant but she has credibility problems" and "cannot rely on the victim's statements; says to 'cancel' any analysis on Long's buccal swab standard."

The victim in this case was under arrest and in custody at the time of defendant's trial and admitted that the State had to keep her locked up to get her to testify against defendant. Given that the State relied primarily on DNA evidence to convict defendant, taken together with the conflicting evidence and credibility problems of the victim, I cannot say that any error in the admission of the DNA testimony was harmless beyond a reasonable doubt.

¶ 87     For these reasons, I respectfully dissent.